**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| VERNON ROSS and DEBRA JOSEY, individually and on behalf of a class of similarly situated African American employees, | ) ) ) ) ) | NO. 1:16-cv-02508-KBJ CLASS ACTION |
| Plaintiffs, | ) ) |  |
| v. | ) ) |  |
| Lockheed Martin Corp., | ) ) |  |
| Defendant. | ) ) |  |

**PLAINTIFFS' SUPPLEMENTAL MEMORANDUM**
**IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL**
**OF THE CLASS ACTION SETTLEMENT**

The Court raised questions about several aspects of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement (ECF No. 4) during the hearing conducted on April 24, 2017. In this supplemental memorandum, Plaintiffs supplement the oral responses to those questions that they provided during the hearing. The accompanying declarations of lead counsel Cyrus Mehri and claims administrator Loree Kovach provide factual support for Plaintiffs' supplemental responses.[1]

**I.      The Proposed Class Action Satisfies the Commonality Requirement**

In *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338 (2011), the Supreme Court explained that to satisfy the commonality requirement for class certification, Plaintiffs must identify "some glue" holding together the alleged reasons for the employment decisions that all class members

---

[1]      As discussed in Part V below, a draft Opt-Out Form and clean and redlined versions of two revised forms of mailed notice, one if the Opt-Out Form is used and the other if it is not, are attached as exhibits to this Supplemental Memorandum. The redlining shows the changes from the form of mailed notice submitted December 23, 2016. Many of the changes were discussed at the hearing and are not mentioned in this Supplemental Memorandum.

challenge; otherwise, "it will be impossible to say that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* at 352. The Court then stated that a "companywide evaluation method that can be charged with bias" can provide the glue that can hold a class together. *Wal-Mart*, 564 U.S. at 353.[2]

In pointing to a bias-prone "companywide evaluation method" as a means of establishing commonality, the Court was explicating its prior decision in *General Telephone Co. of the Southwest v. Falcon*, 457 U.S. 147 (1982). In *Falcon*, it stated that "if the employer 'used a biased testing procedure to evaluate both applicants for employment and incumbent employees, a class action on behalf of every applicant or employee who might have been prejudiced by the test clearly would satisfy the commonality and typicality requirements of Rule 23(a)." *Wal-Mart*, 564 U.S. at 353 (quoting *Falcon*, 457 U.S. at 159 n.15). Under the Uniform Guidelines on Employee Selection Procedures, 29 C.F.R. § 1607.1 *et seq.*, on which the Supreme Court repeatedly has relied, *see, e.g., Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 657-658 (1989); *Local 28 of Sheet Metal Workers' Int'l Ass'n v. EEOC*, 478 U.S. 421, 466 (1986); *Dothard v. Rawlinson*, 433 U.S. 321, 332 n.15 (1977); *Griggs v. Duke Power Co.*, 401 U.S. 424, 433 n.9 (U.S. 1971), tests and performance evaluations are both "selection procedures" governed by the same standards. 29 C.F.R. § 1607.16 (defining "selection procedure" as "[a]ny measure, combination of measures, or procedure used as a basis for any employment decision. Selection procedures include the full range of assessment techniques from traditional paper and pencil tests, performance tests, training programs, or probationary periods and physical, educational, and work experience requirements through informal or casual interviews and unscored application forms.").

---

[2] Proof that Plaintiffs will prevail on the merits is not a "prerequisite to class certification," and Plaintiffs need not show at the class certification stage that the common "questions will be answered, on the merits, in favor of the class." *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1191 (2013).

*Falcon* does not state classes may be approved only if every class member was prejudiced by a test. Rather, it states that "a class action on behalf of every applicant or employee who *might have been* prejudiced by the [biased] test clearly would satisfy the commonality and typicality requirements of Rule 23(a)." 457 U.S. at 159 n.15 (emphasis added). Two hypotheticals reveal the wisdom of this language. Assume that all African-American employees at a company face an equal 10% headwind compared to white employees in obtaining a promotion. Under those facts, a particular African-American employee would be discriminatorily denied a promotion only if he was 1-10% better qualified for a promotion than a competing white employee. If the white employee was better qualified, she properly received the promotion; if the African-American employee was more than 10% better qualified, he would receive the promotion notwithstanding the headwind. But even if in a large percentage of promotions the race-neutral decision was reached, all African-American promotion applicants illegally faced the headwind, and if the headwind could be reduced or eliminated for all of them, the African-American employees (and the employer) would be better off.

The same logic applies in a case, such as this one, in which plaintiffs claim that an employer discriminates in its performance evaluation process. Assume again that all African-American employees face a 10% headwind compared to white employees in their overall rating. When there are only five possible ratings, in many instances that headwind will not affect the final rating. For example, an African-American employee who would have been viewed as a high "meets" performer if the process were race neutral would receive the same "meets" rating, even if because of the headwind the employee was viewed as an average "meets" performer. By contrast, an African-American employee who would have been viewed as a relatively low "meets" performer if the process were race neutral is likely to receive a lower rating as a result of

the headwind. But again, all African-American employees had to endure the illegal headwind in this hypothetical example.

The Class definition in this case encompasses African-American salaried employees below the level of Vice President who at any time between January 1, 2013 and February 29, 2016, "received at least one performance evaluation with a rating below 'significantly exceeds commitments.'" Here, "Lockheed Martin has evaluated all non-represented, salaried employees under essentially the same performance appraisal system, although with some changes over time." Complaint (ECF No. 1), ¶ 12. The system "has applied to non-represented, salaried employees in all of its business areas." *Id.*, ¶ 13. Thus, Lockheed Martin has a "companywide evaluation method" within the meaning of *Wal-Mart.*

African-American employees each year within the class period received lower ratings on average than comparable white employees. *Id.*, ¶¶ 14-15. Plaintiffs allege that the lower ratings arise out of "flaws in the design and implementation of the Lockheed Martin performance appraisal system." *Id.*, ¶¶ 16; *see id.*, ¶¶ 17-24 (identifying alleged flaws). Not every African-American employee received a lower rating, but that is consistent with the existence of an identical or similar headwind against all class members. And because the settlement eliminates African American employees who received exclusively overall ratings of "significantly exceeded commitments" between January 1, 2013 and February 29, 2016 from the class definition, the proposed class is consistent with the language of *Falcon* that a class action may be litigated on behalf of every employee who "might have been prejudiced" by the performance appraisal system.

Finally, Lockheed Martin has used the performance appraisal system as a "selection procedure," that is, the Company uses performance evaluation ratings "to select non-represented,

salaried employees for annual pay increases, certain bonuses, and long term incentive awards. The system also has affected promotion and retention of employees." *Id.*, ¶ 12; *see also* Mehri Supp. Decl., ¶ 3 (describing conclusions of Plaintiffs' statistical expert).  Thus, in the words of *Wal-Mart*, the performance appraisal system provides "a common answer to the crucial question *why was I disfavored*" in annual pay increases, bonuses and incentive awards:  "I received a lower performance appraisal rating as a result of a flawed system."  There may be other reasons as well why an African-American employee received lower pay increases, bonuses, and incentive awards, but neither the Supreme Court nor subsequent appellate and district court opinions hold that the common answer must be the exclusive answer.  *See, e.g., McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 672 F.3d 482, 490 (7th Cir. 2012) (Posner, J.) (directing certification of a class of African-American brokers challenging company's teaming and account distribution policies because, even though there were other causes of racial compensation disparities, "[t]he incremental causal effect (overlooked by the district judge) of those company-wide policies—which is the alleged disparate impact—could be most efficiently determined on a class-wide basis").  And although the relationships between performance appraisal ratings and promotions and between performance appraisal ratings and terminations are a little less clear, the ratings provide a common, although not exclusive, answer to the question *why was I disfavored* for these decisions as well.

       The fact that the flaws in Lockheed Martin's performance appraisal system permit overly subjective decision-making does not alter the conclusion that the proposed class satisfies the commonality requirement.  As Judge Posner explained in *McReynolds*, where the company exercised much less control over the challenged policies than Lockheed Martin does over the performance appraisal process for salaried employees:

> The district judge exaggerated the impact on the feasibility and desirability of class action treatment of the fact that the exercise of discretion at the local level is undoubtedly a factor in the differential success of brokers …. Obviously a single proceeding, while it might result in an injunction, could not resolve class members' claims. Each class member would have to prove that his compensation had been adversely affected by the corporate policies, and by how much.

*Id.* at 490-91; *see Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 988, 990-91 (1988) (explaining that subjective decisionmaking" is an "employment practic[e]" that "may be analyzed under the disparate impact approach").

That Plaintiffs challenge a set of policies that permit excessively subjective decision-making similarly should not prevent class certification here.  As explained in Part II below, if this case were not settled, the issues of whether flaws in the performance appraisal system produced racially biased ratings and whether those biased ratings influenced pay, promotion, and termination decisions would be tried in Phase I proceedings.  The individualized relief claims of class members would be determined in Phase II proceedings, but the need for those individualized proceedings does not defeat commonality.

## II.     The Class Definition Is Appropriate.

As the Court noted, undoubtedly some African-American employees correctly received ratings below "significantly exceeds commitments"; the performances of every African-American employee each year certainly did not merit a "significantly exceeds commitments" rating.  The almost certain inclusion in the Class of some persons who received correct overall ratings, however, does not mean the Class was defined too broadly.

Courts have consistently rejected class definitions that define the class members through the results of individualized merits determinations, such as all African-American employees "who received discriminatorily low performance appraisal ratings," "who received discriminatorily low pay increases" or "who applied for but were discriminatorily denied

6

promotions." These types of class definitions, sometimes called "fail-safe," are perceived as unfair to defendants because putative class members cannot be bound to an unfavorable judgment and as flawed because class members cannot be ascertained until the individual merits process is complete. *See Bynum v. Dist. of Columbia*, 217 F.R.D. 43, 50-51 (D.D.C. 2003) (denying motion for reconsideration of grant of class certification because "the class definition certified by this Court is sufficiently specific that a putative plaintiff would be able to ascertain whether he or she is a member of the class" and in the definition "this Court has not determined the merits of plaintiffs' claims"); *Trosper v. Styker Corp.*, No. 13-CV-0607-LHK, 2014 U.S. Dist. LEXIS 117453, at *21-22 (N.D. Cal. Aug. 21, 2014) ("When the class is so defined, once it is determined that a person, who is a possible class member, cannot prevail against the defendant, that member drops out of the class. That is palpably unfair to the defendant[]." . . . [P]utative members either win or are not part of the class.") (multiple citations omitted).

In both the promotion and performance appraisal hypotheticals discussed in Part I above, no objective, non-fail-safe means exist to identify only those individuals who would have had a better result but for the discriminatory headwind. Pointing to allegations involving Plaintiff Debra Josey (Complaint, ¶ 39), the Court posited limiting the class to African-American employees whose tier ratings were lower than their component competency and behavioral scores would suggest were appropriate. But Plaintiffs also claim that the competency and behavioral scores, not only tier ratings, were adversely affected by the headwind because of flaws in the system's design and implementation. *Id.*, ¶¶ 16-21. And it would be impossible to accurately evaluate whether a particular employee's tier rating was appropriate without also considering the component ratings of all other comparators. *Id.*, ¶¶ 22-23.

The Supreme Court addressed how to deal with the issue that all members of an employment discrimination class action may not have been measurably harmed by a broad policy or practice that had a discriminatory intent or impact in the seminal case of *International Brotherhood of Teamsters v. United States*, 431 U.S. 324 (1977).  The Court explained that class-like[3] employment discrimination cases typically should proceed in two phases.  The first phase addresses whether the employer has engaged in systemic discrimination.  "[A] court's finding of a pattern or practice justifies an award of prospective relief," such as "an injunctive order against continuation of the discriminatory practice."  *Id.* at 361.  In addition to such class-wide relief, "a district court must usually conduct additional proceedings after the liability phase of the trial to determine the scope of individual relief," during which the burden of proof is on the employer to show that it did not discriminate against an individual class member. *Id.* at 361-62.  Thus, during this second "mini-trial" phase, an employer can defeat awards to particular class members by showing that the general practice did not result in injury to those individuals.

The alternative to employment discrimination class actions in which some class members may not have suffered concrete injuries would be individual litigation.  But one or more individual lawsuits might mean a judicial inability to fashion prospective relief against broad policies or practices that have discriminatory intent or effect.  *See Sharpe v. Cureton,* 319 F.3d 259, 273 (6th Cir. 2003) ("While district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an individual suit, such broad relief is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *Brown v. Trustees of Boston Univ.,* 891 F.2d 337,

---

[3]   *Teamsters* involved a "pattern or practice" case brought by the United States under Title VII rather than a private class action case governed by Federal Rule of Civil Procedure 23, but courts apply the *Teamsters* model to class actions as well.  *See, e.g., Taylor v. D.C. Water & Sewer Auth.,* 205 F.R.D. 43, 46 (D.D.C. 2002) (Kennedy, J.).

361 (1st Cir. 1989) ("Ordinarily, classwide relief, such as the injunction here which prohibits sex discrimination against the class of Boston University faculty, is appropriate only where there is a properly certified class. . . . But there is no such reason here for an injunction running to the benefit of nonparties."). The issue of whether broad injunctive relief is available in individual employment discrimination cases has not been definitively addressed in this Circuit, but courts certainly recognize that such relief is problematic. *See, e.g., Felder v. Glickman,* No. 99-1860 (GK), 2001 U.S. Dist. LEXIS 22646, at *14-15 (D.D.C. Jan. 31, 2001) (rejecting request that employer be "enjoined from discriminating against African-Americans when engaging in future hiring and selection practices to fill vacancies" because "[t]here is no basis for entering such a broad injunction as to all African-Americans, and no evidence that these two Plaintiffs need broad injunctive relief to vindicate their individual rights"); *Neal v. Moore*, 1994 U.S. Dist. LEXIS 21339, at *16-17 (D.D.C. Dec. 23, 1994) (certifying class partly because "several courts have questioned whether injunctive relief may be liberally structured to benefit non-parties" and refused "to grant broad injunctive relief to individual claimants"). Thus, denial of class certification on the ground that some class members may not have directly experienced an adverse action almost certainly will mean loss to Plaintiffs and class members of the type of sweeping injunctive relief that Plaintiffs were able to negotiate. Moreover, as a practical matter, even if courts in this Circuit ultimately decide that company-wide injunctive relief is theoretically available in individual lawsuits, the discovery necessary to provide evidentiary support for company-wide relief probably will not be deemed "proportional to the needs of the case" in individual employment discrimination cases. Fed. R. Civ. P. 26(b)(1).

Recognizing the need for employment discrimination class actions, the Supreme Court re-endorsed the *Teamsters* model six years ago in *Wal-Mart,* 564 U.S. at 366-67 ("We have

established a procedure for trying pattern-or-practice cases that gives effect to these statutory requirements. When the plaintiff seeks individual relief such as reinstatement or backpay after establishing a pattern or practice of discrimination, 'a district court must usually conduct additional proceedings . . . to determine the scope of individual relief.' *Teamsters*, 431 U.S., at 361, 97 S. Ct. 1843, 52 L. Ed. 2d 396.")

When the parties agree to a settlement, the claims process effectively replaces the second phase of the *Teamsters* trial process. As discussed below, a claims process may not be as accurate as a series of mini-trials in calculating the amount (if any) to which each Claimant is entitled, but the considerable savings in time and transactional costs, along with the likelihood that more Class Members will participate in a claims process that entails only filling out a form rather than testifying in person and the likelihood that a claims process will generate consistent results, make use of a claims process in the interest of the class as a whole.

## III. The Claims Process Will Allocate the Settlement Fund Among Class Members in a Reasonable, Fair, and Adequate Manner.

The claims process has several built-in protections to assure that it reasonable, fair, and adequate to Class Members.

First, it will be administered by an experienced Claims Administrator who is highly skilled at her job; in the words of lead Class Counsel Cyrus Mehri, "I am not aware of anyone in the country who is better at devising an allocation formula and applying it to information from claim forms to arrive at awards for class members." Mehri Supp. Decl., ¶ 7; *see* Kovach Decl., ¶¶ 2-6 (describing qualifications and experience). Having a third party as the administrator, rather than Class Counsel, provides protection for Class Members. Because Class Counsel has worked closely with the Named Plaintiffs for more than two years, Class Counsel almost certainly would

be biased in their favor if Class Counsel were in charge of the allocation process despite the best of intentions.  Kovach Decl., ¶ 8.

Second, the Claims Administrator must determine allocations using a formula, which the Claims Administrator will devise only after reviewing a sample of the Claim Form responses.  *Id.*, ¶ 16; *see generally id.*, ¶¶ 11-23 (describing likely model for scoring plan in this case).  Although the formula may allow for some measure of subjectivity (for example, allowing a range of points for a particular answer based on the claims administrator's judgment concerning the amount of detail provided by the claimant), the existence of a formula cabins that subjectivity and reduces the opportunity for arbitrary decisions.  *Id.*, ¶ 17; *see United States v. Sutherland*, 9 F. Supp. 204, 206 (D. Mo. 1934) ("the standard must be one that can be expressed in formula. If it is not one that can be so objectively perceived, then in no true sense is it a usable standard; at most it is no more than the whim of an individual.").

Third, the Court will review the formula and, if it finds the formula unfair in any regard, may revise the formula itself or return it to the claims administrator for additional work.  Obviously, this requires the claims administrator to justify the formula as fair and reasonable, which the Claims Administrator will attempt to do.  Kovach Decl., ¶ 6.[4]

The formula will award Claimants points and the amount of each Claimant's award will be derived by multiplying the amount available for distribution to Class Members after deduction of fees and expenses by a fraction, the numerator of which will be that Claimant's points and the denominator of which will be the total points awarded to all Claimants.  This is the method that

---

[4]   Plaintiffs recommend that the Court set the final approval hearing for approximately 170 days after preliminary approval.  If each step in the process takes the maximum amount of time, Claim Forms will be due 130 days after preliminary approval. Settlement Agreement (ECF No. 4-1), § 9.4.  Setting the final approval hearing another 40 days after the Claim Form deadline will give the Claims Administrator time to devise the formula and provide other information that the Court may wish to consider in deciding whether to approve the formula.  The Court could order Plaintiffs to submit their memorandum in support of final approval along with the Claims Administrator's formula and information ten days prior to the hearing, or such other time in advance of the hearing that the Court deems appropriate.

the Claims Administrator almost always uses in allocating moneys in a class settlement where the amount of money for categories of class members is not specified in the settlement agreement and there is no provision for a reverter to the payor in the event that all moneys are not paid to class members. *Id.*, ¶ 7. Trying to assign precise dollar amounts to each Claimant, as would a factfinder, would consume additional time and cost and ultimately reduce the amount available for distribution to Class Members. *Id.*; *see also id.*, ¶¶ 9, 24. Moreover, if the total of such dollar awards exceeded the amount available for distribution, all of the awards would have to be reduced proportionately, making the outcome similar to that of a point formula.

Finally, the claims process is fair in that each Claimant will receive an award because part of the formula will be based on tenure during the liability period. Kovach Decl., ¶ 11. Even if a Claimant cannot identify a similarly situated white employee who was treated better than the Claimant, a minimal award is appropriate because, as discussed above, Plaintiffs allege that flaws in the performance appraisal system created obstacles, or a "headwind," for all Class Members.

## IV.     The Release Appropriately Applies to All Forms of Racial Discrimination.

Under the terms of the settlement, Class Members will release Lockheed Martin from all types of racial discrimination claims. Settlement Agreement (ECF No. 4-1), § 6.2. The scope of the Release is closely matched to the claims for which Class Members will be compensated in this case, which include all types of racial discrimination claims with monetary value except for harassment or hostile environment claims. Plaintiffs believe, based on their investigations, that few Class Members have viable harassment or hostile environment claims, but any Class Member who does may opt out.

Although the primary focus of the Complaint is on flaws in the performance appraisal system that resulted in racial disparities in performance appraisal ratings, Plaintiffs claim that these disparities produced racial disparities in compensation, promotion, and termination decisions. Complaint, ¶¶ 27-34. The analyses of Plaintiffs' expert reflected strong statistical relationships between lower performance appraisal ratings and lower salary increases, less frequent and lower bonuses and awards, fewer promotions, and lower retention rates. Supp. Mehri Decl., ¶ 3.

As a result, Claimants will receive points not only for claims related to performance appraisals, but also for claims related to discrimination in compensation, promotions, and terminations. *See* Claim Form (ECF No. 4-1, at 81-94); Supp. Mehri Decl., ¶ 4. The questions on the Claim Form are not limited to instances in which a Claimant can tie an allegedly discriminatory compensation, promotion, or termination decision to a low performance appraisal rating. Instead, the form seeks information about any allegedly discriminatory compensation, promotion, or termination decision. Thus, the settlement does not go beyond the scope of the lawsuit in releasing claims of racial discrimination with respect to those types of decisions. Virtually all employment discrimination claims (with the exception of harassment, hostile work environment, and retaliation claims, which are discussed below) involve pay, promotion, and termination decisions. Supp. Mehri Decl., ¶ 4.

Hostile work environment, or harassment, claims are the only types of employment discrimination claims that often have monetary value but are not included on the Claim Form. Although participating Class Members will be releasing these claims, they are excluded from the Claim Form because Plaintiffs' investigations, including discussions with employees and Lexis

searches, did not reveal any instances of actionable harassment or of a hostile work environment. *Id.*, ¶ 5.

Requiring Class Members to release one type of claim for which they will not be compensated, or to opt out of the Class if they wish to pursue a hostile environment/harassment claim, is not necessarily unfair or unreasonable. "[A] court may release not only those claims alleged in the complaint and before the court, but also claims which could have been alleged by reason of or in connection with any matter or fact set forth or referred to in' the complaint." *In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 221 (5th Cir. 1981); *accord Vasco v. Power Home Remodeling Group LLC,* No. 15-4623, 2016 U.S. Dist. LEXIS 141044, at *31 (E.D. Pa. Oct. 12, 2016). This doctrine is especially true here for three reasons. First, no evidence has been presented to Plaintiffs that many, if any, Class Members have viable claims of this type. Second, despite Plaintiffs' lack of evidence of such claims, Class Members may opt out of the settlement to pursue their individual harassment or hostile environment claims if they believe those claims to be meritorious. *See Montoya v. PNC Bank, N.A.*, 2016 U.S. Dist. LEXIS 50315, at *85-86 (S.D. Fla. Apr. 13, 2016) (approving settlement partly because "[c]lass members who wish to retain their claims and except themselves from the settlement's terms, including the release, have been given the opportunity to do so by opting out"). Finally, the settlement provides not only for establishment of a large settlement fund, but also for strong programmatic relief. *See In re Baldwin-United Corp.*, 607 F. Supp. 1312, 1325 (S.D.N.Y. 1985) ("the Court is authorized to approve releases of all of the state and federal claims if it determines that the settlements on the totality of the facts are fair, adequate and reasonable") (citing *Corrugated Container*).

As mentioned during the hearing, Class Members who do not opt out will not release retaliation claims, or any types of claims other than racial discrimination. By contrast, the two Named Plaintiffs will be exercising a general release. Supp. Mehri Decl., ¶ 6.

Finally, the time period covered by the Release also is reasonable and fair. Notwithstanding an erroneous statement from Class Counsel during the hearing Monday, the claims to be released arise between January 1, 2013 and the latter of the date of preliminary approval or the date a Claimant executes the Claim Form, whichever is later, provided that the date shall not be later than the date of Final Approval. Settlement Agreement (ECF No. 4-1), § 6.2. Under this formulation, no Class Member will release claims that have not arisen as of the date of the release.

## V. BASED ON THE CLAIMS ADMINISTRATOR'S CONCERNS ABOUT LIKELY CONFUSION, CLASS MEMBERS SHOULD NOT BE SENT AN OPT-OUT FORM

Plaintiffs have made several changes to the form of Notice of Proposed Settlement and Settlement Hearing Notice ("Notice) that was filed with the Court on December 23, 2016. ECF No. 4-1, at 101-16. There are two versions of the revised Notice, with the only difference, as discussed below, concerning the possible use of an Opt-Out Form. A clean version of the Notice that does not refer to an Opt-Out Form is attached as Exhibit A-1, while a redline showing the changes from the December 23, 2016 filing is attached as Exhibit A-2. A clean version of the Notice that refers to an Opt-Out Form is attached as Exhibit B-1, while a redline showing the changes from the December 23, 2016 filing is attached as Exhibit B-2.

Some of the changes reflected in Exhibits A-2 and B-2 address issues raised by the Court during the hearing, such as the elimination of the bottom box on the second page of the Notice, language inserted on pages 7 and 11 making clear that Class Members are not releasing retaliation claims, language on page 7 stating that Class Members who do nothing will not

receive a payment from the settlement fund, and language on page 10 stating that Class Members who submit Claim Forms will receive an award because of the points awarded for tenure during the liability period. Other changes are not intended to be substantive, but are for purposes of clarity or to correct small errors.

During the hearing on preliminary approval, the Court raised the possibility of sending Class Members an opt-out form instead of requiring them to write a communication opting out of the lawsuit, and counsel for the parties agreed to devise such a form. The parties agree to the language of Exhibit C if the Court directs the parties to send an Opt-Out Form to Class Members.

When Class Counsel informed the Claims Administrator of the intent to use an Opt-Out Form, however, she advised against it. She said that, in her experience, large numbers of class members submit the opt-out form believing it to be necessary in order to receive an award, notwithstanding language on the form and in a notice that it should be submitted only if the class member intends to opt out of the lawsuit. Kovach Decl., ¶¶ 25-26. She expects that if the Opt-Out Form is used, the Claims Administrator will receive from some Class Members both an executed Opt-Out Form and an executed Claim Form, and either the Claims Administrator or Class Counsel will have to communicate with those Class Members to ascertain their intent. *Id.*, ¶ 25.

Plaintiffs accordingly suggest that an Opt-Out Form not be used and that the Court order that the form of Notice attached as Exhibit A-1 be sent to Class Members. A proposed form of Order contemplating that the Opt-Out Form not be used accompanies this filing. It replaces the proposed Order submitted to the Court on December 23, 2016 (ECF No. 4-4). However, if the Court continues to believe that an Opt-Out Form should be used, Plaintiffs suggest that the Court order that the form of Notice attached as Exhibit B-1 be sent to Class Members.

## **CONCLUSION**

For the reasons set forth in Plaintiffs Memorandum filed December 23, 2016, in this Supplemental Memorandum, and at the hearing of April 24, 2017, Plaintiffs urge the Court to preliminarily approve the settlement and to enter the proposed Order submitted this day.

Dated: May 2, 2017                                     Respectfully submitted,

_____
Cyrus Mehri
Michael D. Lieder
Joanna K. Wasik
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW
Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cmehri@findjustice.com
mlieder@findjustice.com
jwasik@findjustice.com

Charles V. Firth (*pro hac vice*)
Engelmeier & Umanah, P.A.
706 Second Avenue South
Suite 1100
Minneapolis, MN 55402
Telephone: (612) 455-7724
Facsimile: (612) 455-7740
charlief@e-ulaw.com