# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| VERNON ROSS and DEBRA JOSEY, *on behalf of themselves and all others similarly situated,* | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 16-cv-2508 (KBJ) |
| LOCKHEED MARTIN CORP., | ) ) | |
| Defendant. | ) ) ) | |

## MEMORANDUM OPINION

Named Plaintiffs Vernon Ross and Debra Josey ("Plaintiffs") allege that Defendant Lockheed Martin Corporation ("Lockheed") has "engaged in a pattern or practice of employment discrimination" that is "manifest[] in Lockheed Martin's performance appraisal system." (Compl., ECF No. 1, ¶ 11.) According to Ross and Josey, Lockheed's annual employee performance review process is "flawed in both design and implementation" (*id.*) because "African-American non-represented, salaried employees below the level of Vice President have received lower overall ratings on their annual performance reviews as compared to similarly situated white employees" (*id.* ¶ 15), and the lower ratings have, in turn, resulted in "lower salaries, raises, [and] bonuses, [lower] long term incentive awards, fewer promotions, and a lower retention rate" for African Americans at Lockheed (*id.* ¶ 67). Plaintiffs' three-count complaint claims that Lockheed's performance review process has been systemically injurious in a manner that amounts to both intentional race discrimination (*see id.* ¶¶ 65–68 (Count I))

and disparate impact race discrimination (*see id.* ¶¶ 70–73 (Count II)).  Plaintiff Ross further contends, solely on his own behalf, that Lockheed retaliated against him "for filing a Charge of Discrimination . . . and/or complaining to senior executives at the Company of racial discrimination faced by him and other African-American employees."  (*Id.* ¶ 78 (Count III).)

Critically, Ross and Josey seek to prosecute the race discrimination claims on behalf of the following class of plaintiffs:

> [all] salaried non-represented African-American employees below the level of Vice President who received at least one performance evaluation between January 1, 2013 and February 29, 2016, with an overall rating below 'significantly exceeded commitments' while employed at Lockheed Martin.

(*Id.* ¶ 1.)  The complaint contends that the discrimination claims are susceptible to class-action treatment because, under Lockheed's performance review process, there is an "absence of measurable indicators" of achievement, which has allegedly "resulted in inadequate safeguards against bias in the assessment of African American employees." (*Id.* ¶ 18; *see also id.* ¶ 21 (resting the complaint's systemic discrimination allegations on the fact that "[m]anagers' comments on employee performance have not consistently relied on specific, measurable, time-sensitive measures of employees' performance" and "[a]s a result, similar or even identical performance could garner different ratings under different supervisors").)

Plaintiffs have filed their putative class action complaint along with a proposed Settlement Agreement; therefore, this case has come to this Court fully formed.  (*See* Compl.; Settlement Agreement, ECF No. 4-1.)  One key feature of the resolution that Plaintiffs have negotiated with Lockheed (in addition to a $22.8 million settlement fund

and certain changes to Lockheed's performance appraisal process) is the class members' agreement to release a broad swath of potential legal claims against the company, including claims that have nothing whatsoever to do with Lockheed's performance review procedures. (*See, e.g.*, Settlement Agreement at 22 (stating that the class members agree to release "any and all racial employment discrimination claims of whatever nature, known or unknown," including but not limited to all "claims of alleged racial discrimination in employment or in the provision of employee benefits claims under Title VII, Section 1981, ERISA[,]" and "any other federal, state, or local" law).)[1]

Also noteworthy is what is *not* featured in the proposed Settlement Agreement: *how much money* each class member can expect to receive in exchange for releasing any and all race discrimination claims "that were or could have been" asserted against Lockheed. (*Id.*) Plaintiffs' counsel insists that no class member's expected recovery can be determined, or even estimated, up front; rather, each class member must first formally accept the terms of the Settlement Agreement and complete a detailed form that discloses—for the first time—the potential race discrimination and/or benefits claims that she has already agreed to release. (*See* Tr. of Oral Arg. at 69.) In operation, then, a putative class member must decide whether to opt out of the Settlement Agreement before knowing (1) the nature and value of the potential legal claims that she might otherwise have brought against Lockheed based on her employment history, or (2) the amount that she is likely to receive for participating in the settlement and relinquishing all of her (previously undisclosed) claims.

---

[1] Page-number citations to documents that the parties have filed refer to the page numbers that the Court's electronic filing system automatically assigns.

Before this Court at present is Plaintiffs' motion for preliminary certification of this case as a class action and preliminary approval of the Settlement Agreement. (*See* Pls.' Mot. for Preliminary Approval of Class Action Settlement Agreement ("Mot."), ECF No. 4.) In the motion, Plaintiffs request that this Court make a preliminary determination that the complaint satisfies the requirements of a viable class action under Federal Rule of Civil Procedure 23, and Plaintiffs also seek preliminary approval of the Settlement Agreement so that the class-wide notice and detailed claim forms can be distributed. (*See generally* Mot.; Settlement Agreement.) Plaintiffs have consistently maintained that their putative class and proposed settlement satisfy all of the necessary criteria for certification and approval under Rule 23 such that this case should be permitted to cruise right into the notice and hearing stages of the class-wide settlement process. However, for the reasons explained fully below, this Court has reluctantly concluded that it has no choice but to pump the brakes.

In brief, Plaintiffs have failed to demonstrate that the commonality prerequisite for Rule 23 class certification can be adequately established, because they have not explained *how* it is that Lockheed's performance appraisal process systematically discriminates against African-Americans such that it qualifies as either a "general policy of discrimination" or a "testing procedure or other companywide evaluation method" that gives rise to discrimination claims that are susceptible to common proof. *See Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 353 (2011). This Court also sees several fairness-related red flags when it considers the terms of the proposed Settlement Agreement, including an egregious imbalance between the particular claims alleged in the complaint and the scope of the class members' release; a draconian set of

consequences that results from a putative class member's mere failure to respond to the class-wide notice; and a dearth of crucial information about the potential expected recovery in relation to the claims being released, as is required for adequate assessment of each putative class member's individual settlement position.

Consequently, not only is this Court unable to find that Plaintiffs have defined a certifiable class for the purpose of Federal Rules of Civil Procedure 23(a) and 23(b), the Court must also conclude that the proposed Settlement Agreement cannot be preliminarily approved as "fair, reasonable, and adequate" under Rule 23(e)(2). Accordingly, the instant motion for preliminary approval of the Settlement Agreement must be **DENIED**. A separate order consistent with this memorandum opinion will follow.

## I.    BACKGROUND

### A.    Disparate Treatment And Disparate Impact Claims Under Title VII

Claims of employment discrimination under Title VII may proceed under both "disparate treatment" and "disparate impact" theories. *Ricci v. DeStefano*, 557 U.S. 557, 577 (2009); *see also Griggs v. Duke Power Co.*, 401 U.S. 424, 431 (1971). [2] "Disparate treatment occurs when '[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin.'" *Anderson v. Zubieta*, 180 F.3d 329, 338 (D.C. Cir. 1999) (alteration in original) (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n.15 (1977)); *see*

---

[2] The *Griggs* decision recognized that, even though the Civil Rights Act of 1964 as originally enacted "did not include an express prohibition on policies or practices that produce a disparate impact[,]" claims of disparate impact were nevertheless available under that statute. *Ricci*, 557 U.S. at 577. Congress later amended Title VII to codify the holding of *Griggs* and expressly provide for disparate-impact claims. *See id.* at 578 (citing Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified at 42 U.S.C. § 2000e-2(k)(1)(A))).

*also* 42 U.S.C. § 2000e-2(a)(1) (making it unlawful for an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin"). To make out a *prima facie* case of disparate treatment discrimination, a plaintiff must prove that "(i) [he or she] suffered an adverse employment action (ii) because of [his or her] race, color, religion, sex, or national origin." *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 493 (D.C. Cir. 2008); *see also id.* at 493 & n.1 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). "Proof of discriminatory motive is critical for [disparate treatment] claims." *Anderson*, 180 F.3d at 338 (internal quotation marks and citation omitted).

By contrast, a disparate impact claim arises when "policies or practices that are neutral on their face and in intent . . . nonetheless discriminate *in effect* against a particular group." *Id.* at 339 (emphasis added; internal quotation marks and citation omitted); *see also* 42 U.S.C. § 2000e-2(k)(1)(A)(i) (providing that a plaintiff may establish a *prima facie* disparate impact violation by "demonstrat[ing] that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin").[3] "When presenting a disparate impact claim, a plaintiff must generally 'demonstrate with statistical evidence that the practice or policy has an adverse effect on the protected group.'" *Greater New Orleans Fair*

---

[3] An employer may defend against a disparate impact claim by "demonstrat[ing] that the challenged practice is job related for the position in question and consistent with business necessity[.]" 42 U.S.C. § 2000e-2(k)(1)(A)(i); *see also Ricci*, 557 U.S. at 578. "Even if the employer meets that burden, however, a plaintiff may still succeed by showing that the employer refuses to adopt an available alternative employment practice that has less disparate impact and serves the employer's legitimate needs." *Ricci*, 557 U.S. at 578 (citing 42 U.S.C. § 2000e-2(k)(1)(A)(ii), (C)).

*Housing Action Ctr. v. U.S. Dep't of Housing and Urban Dev.*, 639 F.3d 1078, 1085–86 (D.C. Cir. 2011) (quoting *Garcia v. Johanns*, 444 F.3d 625, 633 (D.C. Cir. 2006)). Furthermore, and notably, a plaintiff must demonstrate that she was personally injured as a result of an employment policy with a disparate impact in order to be able to challenge the policy under Title VII. *See* 42 U.S.C. § 2000e-5(f) (conferring a cause of action under Title VII on a "person claiming to be aggrieved" by an unlawful employment practice); *see also Melendez v. Ill. Bell Tel. Co.*, 79 F.3d 661, 668 (7th Cir. 1996); *Young v. Covington & Burling LLP*, 736 F. Supp. 2d 151, 158–59 (D.D.C. 2010).

Both disparate treatment and disparate impact theories are available to an injured plaintiff who seeks to challenge discrimination that results from an employer's policy of delegating employment decisions to individual supervisors based on subjective or discretionary criteria. *See Watson v. Fort Worth Bank & Trust*, 487 U.S. 977, 991 (1988). A plaintiff challenging such a policy under a disparate impact theory is relieved from having to prove that discriminatory intent motivated either the policy of delegation or the particular adverse employment decision that affected her, *see id.* at 986–87; however, crucially, "the plaintiff's burden in establishing a prima facie case goes beyond the need to show that there are statistical disparities in the employer's work force." *Id.* at 994 (plurality opinion).[4] This is because "[i]t is completely unrealistic to assume that [employers'] unlawful discrimination is the sole cause of . . . statistical imbalances in the composition of their work forces." *Id.* at 992 (plurality opinion). Rather, to support a claim for disparate impact, "the plaintiff must offer

---

[4] A majority of the Supreme Court expressly adopted the reasoning of Justice O'Connor's plurality opinion in *Watson* during the following Term. *See Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656–58 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e-2(k).

statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group." *Id.* at 994 (plurality opinion). Put another way, "[a]s a general matter, a plaintiff must demonstrate that it is the application of a specific or particular employment practice that has created the disparate impact under attack." *Wards Cove Packing Co.*, 490 U.S. at 657; *see also* 42 U.S.C. § 2000e-2(k)(1)(B)(i) (providing that, unless a disparate-impact plaintiff can establish that making such a showing is impossible, she must "demonstrate that each particular challenged employment practice causes a disparate impact").

## B. Plaintiffs' Allegations In This Case

On December 23, 2016, Plaintiffs filed the complaint in the instant case, which alleges that Lockheed, "one of the largest aerospace, defense, and technology companies in the world" (Compl. ¶ 8), engaged in race discrimination against its African-American employees through the operation of the performance appraisal system that the company uses to evaluate all of its employees (*see id.* ¶ 11). According to the complaint, over the course of a three-year period between January of 2013 and February of 2016 (*see id.* ¶ 1), Lockheed's performance appraisal system "produced a disparate impact in performance ratings, and consequently in the promotions, compensation, and retention of salaried African-American employees below the level of Vice President" (*id.* ¶ 11). The two named plaintiffs, Vernon Ross and Debra Josey, allege that they were injured by the performance appraisal system and seek to certify a class of nearly all current and former African-American Lockheed employees below the rank of Vice

President who were evaluated pursuant to the performance appraisal system during the relevant three-year period. (*See id.* ¶¶ 11, 57.)

        1.   The Performance Appraisal System

According to the complaint, between 2013 and 2016, Lockheed "evaluated all non-represented [i.e., non-union], salaried employees under essentially the same performance appraisal system, although with some changes over time." (*Id.* ¶ 12.) Lockheed used this performance appraisal system "in all of its business areas— Aeronautics, Rotary and Missions Systems, Missiles and Fire Control, Space Systems, and Enterprise Operations" (*id.* ¶ 13)—and the system consisted of the following basic components. First of all, every year (at the beginning of the performance appraisal cycle) each salaried employee was required to identify "commitments" that reflected the employee's individual goals for her work at Lockheed during the upcoming year, with manager approval. (*See id.* ¶¶ 17–18.) Then, at the end of the calendar year, the employee would receive a performance review in which a manager evaluated that employee's work, using both written comments and numerical ratings. (*See id.* ¶ 20.) The written comments addressed the degree to which the employee had lived up to each commitment, and the numerical ratings reflected the employee's performance (on a 5.0 scale) with respect to meeting both her individual commitments and a series of desired "behaviors" that Lockheed had prescribed across the entire company. (*Id.* ¶¶ 17, 20, 36.) An employee's performance review also aggregated each of these numerical rankings to calculate a single "composite score." (*Id.* ¶ 20.)

Once all managers completed their performance reviews of the individual employees in their purview, groups of managers then gathered for "calibration" sessions

that were held in order to determine an "ultimate tier placement" for the employees under their supervision.  (*Id*. ¶¶ 22–23.)  A tier placement reflected an overall assessment of an employee's performance vis-à-vis the identified commitments; for example, the highest tier was called "significantly exceeds commitments[.]"  (*Id*. ¶ 57.) Notably, these calibration sessions operated on a curve: there were four possible tiers (*see id*. ¶ 35), and the manager groups placed "predetermined percentages of [the] employees" that were under consideration in a given session into each of the four tiers (*id*. ¶ 22).  In doing so, the managers purportedly took account of each employee's performance review as well as commentary from other participants in the calibration session, including participants who had not reviewed that employee's individual performance appraisal results.  (*See id*. ¶ 23.)  Ultimately, an employee had the opportunity to appeal her performance review and overall tier placement under the appraisal system, but "[v]ery few appeals [were] brought or [were] successful in altering overall ratings."  (*Id*. ¶ 24.)

According to the complaint, the overall tier placement that an employee received after her individual performance review and the group calibration session played a prominent role in Lockheed's subsequent decisions regarding base compensation, bonus payments, and promotions.  (*See id*. ¶¶ 27–32.)  Specifically, Plaintiffs maintain that the "standard percentage increase in salary" that Lockheed awards to employees each year was "based on their tier and their place in the salary range for their position."  (*Id*. ¶ 28.)  Lockheed also "bestow[ed] discretionary merit increases" in compensation, as well as "a variety of monetary awards and bonus programs[,]" based in part on an employee's overall tier placement.  (*Id*. ¶¶ 29–30.)  Finally, "[f]or certain positions at

Lockheed Martin, employees may advance through what are called growth promotions[,]" which "represent movement to a higher level within the employees' existing positions" and which were "based in part on employees' . . . performance evaluations." (*Id.* ¶ 31.)

Plaintiffs' complaint alleges that, due to flaws in the design and implementation of the performance evaluation system, Lockheed's performance review process "has produced a disparate impact based on race in evaluation ratings and, consequently, in the compensation, promotion, and retention of African-American employees." (*Id.* ¶ 14.) For example, with respect to the individual employee performance reviews, the complaint asserts that Lockheed failed to prescribe "measurable indicators" for managers to use when deciding how to rate an employee for a particular objective or behavior, and therefore Lockheed "ha[s] not provided adequate safeguards against bias in the assessment of African American employees." (*Id.* ¶ 19; *see also id.* ¶ 18.) In addition, according to the complaint, managers' written comments "have not consistently relied on specific, measurable, time-sensitive measures of employees' performance[,]" which means that "similar or even identical performance could garner different ratings under different supervisors." (*Id.* ¶ 21.)

The complaint also identifies flaws with respect to the group calibration sessions. Plaintiffs allege that the "discussion of any one employee was cursory at best"; that "employees holding different positions but at the same level were compared against one another"; that "at times, employees were represented by managers who knew little about their performance if the employees' manager was unavailable to attend a given meeting"; and that, "[a]s a result, employees may have been assigned to the

forced distribution tiers by persons with little if any direct knowledge of employees' performance[.]" (*Id.* ¶ 23.) Furthermore, with respect to the appeals process, the complaint alleges that the right to appeal "does not rectify the biased assessments resulting from the Company's performance appraisal system" because employees do not have "an adequate right to appeal to a manager who was not involved in preparing the review from which [the employee is] appealing." (*Id.* ¶ 24.)

The complaint maintains that, as a consequence of these alleged flaws in the performance appraisal process, Lockheed's evaluation system "allow[s] for racially biased assessments of employees." (*Id.* ¶ 12.) The result, Plaintiffs contend, is that "African-American non-represented, salaried employees below the level of Vice President have received lower overall ratings on their annual performance reviews as compared to similarly situated white employees[,]" and Plaintiffs also allege, "[u]pon information and belief," that this disparity "is statistically significant." (*Id.* ¶ 15.) In addition, Plaintiffs assert that the disparity in overall performance ratings has had corresponding effects "in the compensation, promotion, and retention of African-American employees." (*Id.* ¶ 14; *see also id.* ¶ 28 (stating that, "[u]pon information and belief," "discrimination in the performance appraisal process" caused disparities in merit salary increases); *id.* ¶ 32 (performance appraisal system led to disparities in growth promotions); *id.* ¶¶ 33–34 (performance appraisal system led to disparities in retention rates).) Thus, Plaintiffs attribute the alleged disparities in compensation, promotion, and retention to "flaws in the design and implementation of the Lockheed

Martin performance appraisal system, including the nature of the calibration and validation process." (*Id.* ¶ 16.)[5]

### 2. Allegations Regarding The Named Plaintiffs

Plaintiffs Debra Josey and Vernon Ross allege that they have been personally injured as a result of Lockheed's performance appraisal system. (*See id.* ¶¶ 35–56.) Plaintiff Josey is a current Lockheed employee and has worked at the company and its predecessors since 1983. (*See id.* ¶ 7.) She is currently a Software Engineer Manager in Lockheed's Rotary and Mission Systems division in Florida, and she previously worked as an Engineering Leadership Development Program Manager in Lockheed's Information Systems and Solutions division in Maryland. (*See id.*) Josey alleges that she "received lower ratings than similarly situated white employees during her employment at Lockheed Martin despite her stellar performance throughout the [2013–2016] period." (*Id.* ¶ 35.) Josey contends that the effects of the performance appraisal system on her are manifest when one compares the relatively low overall tier placements she received during the relevant period—second tier (out of four) for her work in 2012, third tier for 2013, and third tier for 2014—with the high numerical ratings and positive written comments that she received in her individual performance reviews during that same timeframe. (*See id.* ¶¶ 35–37.) Josey alleges that the third-tier ratings she received for 2013 and 2014 "put her below average[,]" notwithstanding

---

[5] The complaint also asserts that, "[i]n addition to the flaws in the performance appraisal system, [certain] changes implemented by former Senior Vice President of Human Resources John Lucas increased the discrimination against African American employees" and "diminished Lockheed Martin's efforts to encourage racial diversity at the Company." (Compl. ¶¶ 25–26.) These Lucas-related allegations appear in two stray paragraphs that stand alone in the complaint (*see id.*), and John Lucas is not mentioned further. No specifics are provided regarding his conduct, the "changes" that were made under his supervision, or the alleged "discrimination" that African-American employees suffered due to his actions.

the fact she received composite numerical ratings of 4.1 and 3.9 (out of 5.0) on her individual performance reviews in those two years—ratings that, she alleges, "show that she substantially exceeded Lockheed Martin's expectations." (*Id.* ¶ 36.) Moreover, in contrast to the third-tier rating that she received in 2014, Josey's performance review for that same year "did not have any negative comments concerning her commitments or her behavioral objectives." (*Id.* ¶ 37.) Josey maintains that the divergence between her individual performance review and her overall tier rating is attributable to the fact that, during group "calibration sessions[,]" she was compared to employees with "markedly different roles" from hers. (*Id.* ¶ 38.) Josey appealed her tier placement for 2013, but her appeal was unsuccessful. (*See id.* at 39.)

In the complaint, Josey alleges that, "[a]s a result of her lower-tier performance ratings, [she] has been paid less than her white counterparts with the same or less experience" (*id.* ¶ 40); that she did not receive any bonuses or awards in 2013 or 2014 (*see id.* ¶ 41); and that her performance review ratings have "negatively impacted her ability to be promoted within the company" (*id.* ¶ 42). With respect to promotions, Josey alleges that she unsuccessfully applied for 55 positions between 2012 and 2015, of which at least 37 would have constituted promotions, and that in the four cases in which she knows the identity of the candidate who was selected for the position, three of the successful candidates were white employees who Josey believes were less qualified than she. (*See id.* ¶ 43.) In 2015, Josey was notified of her impending layoff as part of a reduction in force (a development that she believes would not have taken place "if she had received higher ratings"); however, she avoided being laid off by

accepting a different position at the same level that required her to relocate from Maryland to Florida. (*Id.* ¶ 44.)

Plaintiff Vernon Ross is a former Lockheed employee who worked for the company from 1991 to 2015, most recently as the Director of STEM, Generations, and Higher Education in Human Resources in Lockheed's Enterprise Operations division. (*See id.* ¶ 6.) Like Josey, Ross alleges that he "received ratings lower than those of similarly situated white employees during his time at Lockheed Martin despite commendable work performance." (*Id.* ¶ 46.) Ross also contends that "[t]he contrast between [his] written reviews and his [tier ratings] shows that ratings have a weak relationship to performance." (*Id.* ¶ 48.) Ross was placed in the second tier out of four for 2012, the third tier for 2013, and the third tier for 2014 (*see id.* ¶ 47), and alleges that these tier placements stand in contrast with the uniformly positive written comments that he received on his performance review for 2014 (*see id.* ¶ 48). Ross "does not know against whom he was compared at calibration sessions," but "his direct manager told him that he was calibrated with all Human Resources Directors, regardless of the wide variation in duties." (*Id.* ¶ 50.) Ross alleges that because of his "unique positions at Lockheed Martin throughout the period from 2011 through 2015 posing unusual challenges[,]" there were "no proper comparators for his position." (*Id.*) Ross appealed the results of his 2013 performance appraisal, and although Lockheed changed two of the individual numerical ratings on his performance reviews during the appeals process, Ross's overall tier placement remained unchanged. (*See id.* ¶ 53.)

The complaint alleges that Ross's relatively low tier ratings "prevented him from advancing within the Company[,]" and that "he was repeatedly bypassed in promotions

to a Vice President position in favor of white employees who often had lesser credentials than him." (*Id.* ¶ 52.) Ross adds that he "received only one long term incentive award" during his 24 years as a Lockheed Martin employee. (*Id.* ¶ 51.) In 2015, Lockheed notified Ross that it planned to terminate his position as part of a reduction in force (*see id.* ¶¶ 55–56), and Ross then "applied to over 40 jobs within Lockheed Martin," some at his then-current level and some at lower levels, but he did not receive any offers (*id.* ¶ 56). Ross alleges that he "was unable to find a new job due in significant part to the discriminatorily low appraisal ratings he had received." (*Id.*) Ross's employment was terminated at the end of 2015 (*see id.*), and according to the complaint, he received the initial notice of termination "[s]hortly after" he filed a charge of discrimination with the EEOC against Lockheed (*id.* ¶ 55). Ross also alleges that the EEOC charge was not his first formal complaint: in July of 2014, he allegedly "complained internally of the discrimination that he and other African American employees faced at Lockheed Martin." (*Id.* ¶ 54.)

### 3. The Class Definition, Allegations, And Claims

As mentioned above, Josey and Ross seek to bring this lawsuit as a class action on behalf of a class that the complaint defines as follows:

> [A]ll African-American salaried employees below the level of Vice President employed by Defendant in the United States for at least one day between January 1, 2013 and February 29, 2016, and who received at least one performance evaluation during that period with an overall rating below "significantly exceeds commitments[.]"

(*Id.* ¶ 57.) Several groups of African-American employees who might otherwise be included within this definition are expressly excluded from the putative class:

> (1) employees who signed release agreements, (2) union-represented employees, (3) individuals who have asserted claims of race discrimination against Lockheed Martin, which remain pending before

> any local, state or federal agency or in any state or federal court as of the date of preliminary approval, (4) individuals employed by Sandia Corporation, and (5) individuals who became (or become) employees of Lockheed Martin or one of its subsidiaries as a consequence of stock or asset acquisitions consummated on or after January 1, 2012 including, but not limited to, the following transactions: Industrial Defender, Materion Assets, Deposition Sciences, Astrotech AssetsZeta Associates, Sun Catalytix, Systems Made Simple, and Sikorsky.

(*Id.*) Moreover, and notably, as it relates to the allegedly discriminatory performance review process, the proposed class definition does not contain any objective criteria that permit identification of the particular African-American employees who allegedly suffered concrete injury as a result of Lockheed Martin's performance appraisal system—i.e., those African-American employees who demonstrably *should have* received either higher numerical rankings or a higher tier rating than Lockheed assigned to them during the relevant period. (*See id.*)

The complaint alleges that, as defined, the putative class contains "over 5,500 members who worked in over 40 states across the United States" (*id.* ¶ 59), and that Ross and Josey "are members of the Class they seek to represent" (*id.* ¶ 58). The complaint also contains several allegations regarding the putative class that expressly aim to demonstrate that the prerequisites to class certification set forth in Federal Rule of Civil Procedure 23 are satisfied, and that are discussed at greater length below. (*See id.* ¶¶ 59–64; *see also infra* Part III.A.)

With respect to the legal claims that Plaintiffs seek to maintain on behalf of the class, the complaint alleges, in two separate counts, that Lockheed's performance appraisal system subjected members of the proposed class to intentional and disparate impact race discrimination, and a third count alleges that Plaintiff Ross was retaliated against as a result of his discrimination complaints. (*See* Compl. ¶¶ 65–79.) To be

specific, as mentioned above, Count I of the complaint alleges that "Lockheed Martin intentionally discriminated against Plaintiffs Ross and Josey and members of the proposed Class on the basis of their race by assigning African-American employees lower ratings than other employees in the performance appraisal system," in violation of 42 U.S.C. § 1981. (*Id.* ¶ 67.) In Count II, the complaint alleges that "Lockheed Martin has maintained a pattern or practice of employment discrimination against African-American employees in performance appraisal ratings" (*id.* ¶ 72), and that Lockheed Martin's policies and practices "have had a disparate impact against African-American employees in performance appraisal ratings" (*id.* ¶ 73), both in violation of Title VII of the Civil Rights Act of 1964. Finally, Count III of the complaint alleges that Ross "has suffered [an] adverse employment action because Defendant retaliated against him for filing a Charge of Discrimination with the EEOC and/or complaining to senior executives at the Company of racial discrimination faced by him and other African-American employees." (*Id.* ¶ 78.) Plaintiffs' complaint seeks declaratory, monetary, and injunctive relief. (*See id.*, Prayer for Relief, ¶¶ a–d.)

### C.    The Proposed Settlement Agreement

On December 23, 2016, Plaintiffs filed the putative class action complaint along with a proposed Settlement Agreement, and asked this Court for both preliminary certification of the proposed class for settlement purposes under Federal Rule of Civil Procedure 23(a) and (b), and preliminary approval of the Settlement Agreement under Federal Rule of Civil Procedure 23(e). (*See* Pls.' Mot. for Prelim. Approval of Class Action Settlement Agreement ("Mot."), ECF No. 4; *see also* Settlement Agreement, Ex.

A to Mot., ECF No. 4-1.)[6] The proposed Settlement Agreement provides programmatic and monetary relief to members of the class. The programmatic relief primarily consists of the establishment of a "council" that will recommend that certain changes be made to Lockheed's performance evaluation process (including ending the calibration session procedure), ensure that diverse slates of candidates are considered for open positions, and review salaries to ensure equity. (*See* Settlement Agreement at 28–33.) Lockheed also agrees to implement inclusion training, to improve its collection of data regarding performance evaluations and employee advancement, and to fulfill certain obligations to report this data to its board of directors and to Class Counsel. (*See id*. at 34–40.)

As for monetary relief, according to the Settlement Agreement, Lockheed has agreed to pay $22.8 million into a fund that is to be distributed among the members of the class who affirmatively opt to participate in the settlement based on criteria that a Claims Administrator will determine after gathering information from the class members, as described below. (*See id*. at 41–47.) Regardless, Plaintiffs' counsel will be paid 28% of this settlement fund as attorneys' fees, plus $225,000 per year for four years as compensation for their role in supervising the Settlement Agreement's programmatic relief. (*See id*. at 53.) Counsel would also be reimbursed for their litigation expenses to date, which are approximately $125,000. (*See id*.; Mot. at 39.)

---

[6] After the Court's motion hearing, Plaintiffs also filed a supplemental memorandum in support of their approval motion (*see* Pls.' Suppl. Mem. in Supp. of Pls.' Mot. for Prelim. Approval ("Suppl. Mem."), ECF No. 13), as well as a Notice of Supplemental Authority alerting the Court to a recent D.C. Circuit decision affirming a class certification order (*see* Pls.' Notice of Suppl. Authority, ECF No. 14 (discussing *DL v. District of Columbia*, 860 F.3d 713 (D.C. Cir. 2017))).

For the class members' part, the Settlement Agreement contains a broad release of legal claims that extends well beyond any claims that arise from the allegedly discriminatory operation of Lockheed's performance appraisal system, and also requires that class members act affirmatively to obtain any monetary benefit in exchange for releasing their claims. That is, per the agreement, all class members who do not affirmatively opt out will automatically release "*any and all racial employment discrimination claims* of whatever nature, known or unknown," including "*any and all claims of racial discrimination in employment or in the provision of employee benefits*" that have arisen in the context of their employment relationship with Lockheed at any time up until the moment the class member signs his or her claim form. (Settlement Agreement at 22; *see also* Tr. of Oral Arg. at 27 (counsel for Plaintiffs acknowledging that the release effectively includes "[a]ny and all race discrimination claims[,]" including a claim that "has nothing to do with the evaluations that [an employee] receive[s] from [her] employer"); Suppl. Mem. at 12 (stating that "[u]nder the terms of the settlement" in this case, class members "will release Lockheed Martin from *all* types of racial discrimination claims" (emphasis added)).)[7] Yet, a class member who wishes to receive any portion of the settlement fund as compensation for this broad release of claims must go further, by undertaking to complete an extensive claim form and timely submit it to the designated Claims Administrator. (*See* Settlement Agreement at 44; *see also* Claim Form, Ex. 2 to Settlement Agreement, ECF No. 4-1.) Thus, class members who do not respond to the notice of settlement in any fashion not

---

[7] The named Plaintiffs also specifically agree to release all claims they may have against Lockheed Martin, whether or not related to race discrimination. (*See* Settlement Agreement at 24.)

only have all of their discrimination and benefits claims extinguished, they also forfeit entirely any opportunity to receive any monetary compensation for those extinguished claims.[8]

To facilitate award determinations, the claim form that class members are asked to complete asks a wide-ranging series of questions that seek information not only about the class members' experiences in regard to Lockheed's performance review system (i.e., the subject matter of the complaint), but also about *any* instance of race-based discrimination that class members believe they may have suffered during their employment at Lockheed. (*See, e.g.*, Claim Form at 84 (asking about any form of race discrimination); *id*. at 86 (asking about discriminatory non-promotions); *id*. at 87 (asking about discriminatory terminations).) The Settlement Agreement then leaves it to the Claims Administrator to evaluate a class member's individual legal claims and to allocate the settlement fund accordingly. (*See* Settlement Agreement at 45–47; Kovach Decl. ¶¶ 11–23; *see also* Kovach Decl. ¶ 15 (explaining that the Claims Administrator "will also assign points based off of Claim Form responses").)

---

[8] Under the proposed Settlement Agreement, even those class members who *do* complete the claim form and submit it to the Claims Administrator apparently are not automatically entitled to receive any compensation in exchange for releasing their claims. During the hearing that this Court held on April 24, 2017, Plaintiffs' counsel orally represented that "everyone will get at least something[,]" but counsel based that representation on the fact that one of the factors that the Claims Administrator will purportedly consider in deciding how much a particular class member will receive is "the number of weeks worked for Lockheed Martin during the class period[,]" and "there won't be anybody in the class who hasn't worked there at least for some period." (Tr. of Oral Arg. at 74 (discussing Settlement Agreement at 45); *see also* Decl. of Loree Kovach ("Kovach Decl."), Ex. 7 to Suppl. Mem., ECF No. 13–7, ¶ 11 (explaining that the length-of-employment factor "will likely result in each Claimant receiving at least some award").) However, the Settlement Agreement itself does not specify a minimum amount of compensation for each class member, and it neither instructs the Claims Administrator regarding how to weigh each of the six listed factors nor notifies class members of how the Claims Administrator will go about doing so. (*See* Settlement Agreement at 45.)

Significantly, the Settlement Agreement provides no guidance regarding how the Claims Administrator will distribute the settlement fund, what the minimum recovery amount will be for any class member who submits a claim form, or what the average recovery will be (either for class members in general or for class members who indicate on their claim form that they have experienced other types of discrimination). Nor does the class notice provide any such information to the class members. (*See generally* Notice of Class Action ("Class Notice"), Ex. 4 to Settlement Agreement, ECF No. 4-1.) And because each person who is awarded money from the settlement fund "will be required to keep the amount of their award confidential" (Settlement Agreement at 47), it also appears that class members will never be able to discern this information. At the motion hearing, Plaintiffs' counsel made clear that only after all class members have decided whether or not to opt out and have returned their detailed claim forms will Plaintiffs' counsel—with aid from the Claims Administrator—submit a final allocation of the settlement fund to the Court for approval, and as a practical matter, this final accounting might not take place until after the Court holds its final approval hearing. (*See* Tr. of Oral Arg. at 86 (stating that "[t]he actual allocation I believe will still be in process at th[e] time [of the final approval hearing]").)

In anticipation of the process described above, the Settlement Agreement contemplates that the Claims Administrator will send written notice of this lawsuit and of the proposed settlement to all class members shortly after the Court issues a preliminary approval order. (*See* Settlement Agreement at 43–44; *see also* Class Notice.) The proposed notice offers each class member four options: (1) fill out and return the attached claim form and participate in the settlement; (2) opt out of the

settlement; (3) submit an objection to the Court regarding the fairness of the settlement; or (4) do nothing. (*See* Class Notice at 102.) Any opt-out request must include certain identifying information, as well as a verbatim copy of the specific opt-out language that appears in the class notice. (*See id.* at 110–11.)[9] Individuals who do nothing—that is, who neither follow the opt-out procedure nor submit a claim form—both forfeit any and all race discrimination claims they may have against Lockheed and also lose the opportunity to recover a portion of the settlement fund. (*See* Settlement Agreement at 24.) During the motion hearing, Plaintiffs' counsel estimated based on his experience that approximately 30–50% of class members will not respond to the notice in any fashion. (*See* Tr. of Oral Arg. at 33–34).

## II.    LEGAL STANDARDS

The district court's role in reviewing a proposed settlement agreement in a class-action lawsuit follows a "three-stage process, involving two separate hearings[.]" 4 William B. Rubenstein, *Newberg on Class Actions* § 13:10 (5th ed. 2014); *see also* Fed. Judicial Ctr., *Manual for Complex Litigation* § 21.632 (4th ed. 2004). "First, the parties present a proposed settlement agreement to the court for so-called 'preliminary approval.'" 4 *Newberg on Class Actions* § 13:10 (emphasis omitted). "If the case is presented for both class certification and settlement approval, the certification hearing and preliminary fairness evaluation can usually be combined." *Manual for Complex Litigation* § 21.632. "Second, if the court does preliminarily approve the settlement

---

[9] If a certain number of class members opt out of the Settlement Agreement, Lockheed Martin will have the option to either void the agreement or retrieve from the settlement fund $4,000 per class member who opts out. (*See* Settlement Agreement at 19.) The Court granted the parties' joint motion for leave to file the requisite number of opt-outs that trigger this provision under seal. (*See* Sealed Mot., ECF No. 5; Min. Order of Apr. 25, 2017.)

(and conditionally certify the class), notice is sent to the class describing the terms of the proposed settlement" and explaining class members' options with respect to the settlement agreement, including the right to object to the proposed settlement. 4 *Newberg on Class Actions* § 13:10 (emphasis omitted); *see also* Fed. R. Civ. P. 23(e)(1), (e)(5). Finally, the court holds a hearing after which "the court decides whether or not to give 'final approval' to the settlement[,]" which "can also encompass a decision certifying the class" if the court has not made that decision already. 4 *Newberg on Class Actions* § 13:10.

The instant lawsuit is presently at the preliminary approval stage, and Plaintiffs seek an order that both preliminarily certifies the class and preliminarily approves the Settlement Agreement. (*See generally* Mot.)

## A.    Class Certification

Parties frequently seek to certify a class for settlement purposes, sometimes (as in this case) because they have "settle[d] before . . . even a class action complaint has been filed." *Manual for Complex Litigation* § 21.132; *see also Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 618 (1997) (noting that "the 'settlement only' class has become a stock device"). "When presented with a settlement-only class, a court must determine whether the proposed class satisfies the requirements of Federal Rule of Civil Procedure 23, with one exception: the court does not need to consider whether 'the case, if tried, would present intractable management problems[.]'" *Alvarez v. Keystone Plus Constr. Corp.*, 303 F.R.D. 152, 159 (D.D.C. 2014) (quoting *Amchem*, 521 U.S. at 620). That lone exception aside, the remaining class-certification requirements "demand undiluted, even heightened, attention in the settlement context." *Amchem*, 521 U.S. at 620.

A court may certify a class under Rule 23 only if it satisfies all of the prerequisites set forth in Rule 23(a) and at least one of the three requirements of Rule 23(b). *See Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1432 (2013). Under Rule 23(a), the party seeking class certification must demonstrate that: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Courts generally refer to these prerequisites as "numerosity, commonality, typicality, and adequacy of representation[.]" *Amgen v. Conn. Retirement Plans & Trust Funds*, 568 U.S. 455, 460 (2013). As relevant here, in order to satisfy the commonality requirement, "[class members'] claims must depend upon a common contention[,]" and "[t]hat common contention . . . must be of such a nature that it is capable of classwide resolution— which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350.

Rule 23(b) lays out different requirements for three different "types of class actions." Fed. R. Civ. P. 23(b). Plaintiffs here seek certification under Rules 23(b)(2) and 23(b)(3), relying on Rule 23(b)(2) for purposes of their requested injunctive relief and Rule 23(b)(3) for purposes of their requested monetary relief. (*See* Mot. at 27–30.) *See also Eubanks v. Billington*, 110 F.3d 87, 96 (D.C. Cir. 1997) (explaining that a court "may adopt a 'hybrid' approach" under Rule 23(b), "certifying a (b)(2) class as to the claims for declaratory or injunctive relief, and a (b)(3) class as to the claims for monetary relief"); *accord* 2 *Newberg on Class Actions* § 4:1. Under Rule 23(b)(2), a

class action may be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]" Fed. R. Civ. P. 23(b)(2). Under Rule 23(b)(3), a class action may be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

When certifying a class, the court "must define the class and the class claims, issues, or defenses[.]" Fed. R. Civ. P. 23(c)(1)(B). "Defining the class is of critical importance" because, among other things, "it identifies the persons . . . entitled to relief [and] bound by a final judgment," and as a result, "[t]he definition must be precise, objective, and presently ascertainable." *Manual for Complex Litigation* § 21.222. "The class definition should describe the operative claims, issues, or defenses, such as injury resulting from securities fraud or denial of employment on account of race." *Id.*; *see also Kohen v. Pac. Inv. Mgmt. Co. LLC*, 571 F.3d 672, 677 (7th Cir. 2009) ("[I]f the definition is so broad that it sweeps within it persons who could not have been injured by the defendant's conduct, it is too broad."); *Thorpe v. District of Columbia*, 303 F.R.D. 120, 141–42 (D.D.C. 2014) (assessing whether class definition was "fatally overbroad" by virtue of including individuals who had not plausibly suffered an injury).

Notably, courts have taken divergent approaches to applying Rule 23 when a party moves for a "preliminary" or "conditional" certification order and requests preliminary approval of a class settlement agreement as a prelude to distributing notice

to the class.  *See* 4 *Newberg on Class Actions* § 13:18 (describing the split in authority).

"Most courts" have held that "a less stringent standard applies at the preliminary

approval phase with regard to the requirements for class certification."  *Id.* (citing, e.g.,

*Schoenbaum v. E.I. DuPont de Nemours & Co.*, No. 4:05CV01108, 2009 WL 4782082,

at *5 (E.D. Mo. Dec. 8, 2009)).  Under this approach, at the preliminary approval stage,

the court "make[s] a preliminary determination that the proposed class satisfies the

criteria set out in Rule 23(a) and at least one of the subsections of Rule 23(b)."  *Manual*

*for Complex Litigation* § 21.632.  This approach "contemplates that formal class

certification will be combined with the [final] fairness hearing," and thus, at the

preliminary approval stage, the judge merely scans for "obvious impediments to class

certification" so as to save the plaintiff the trouble of noticing the hearing on final

settlement approval in cases where the court foresees that the formal certification

motion will be a non-starter.  *Schoenbaum*, 2009 WL 4782082, at *5.

Other courts, however, "undertake a full certification analysis under Rule 23(a)

and (b) before addressing whether a proposed settlement should be *preliminarily*

approved."  4 *Newberg on Class Actions* § 13:18 (emphasis in original) (citing, e.g.,

*Ephedra Prods. Liab. Litig.*, 231 F.R.D. 167, 170 (S.D.N.Y. 2005)).  In explaining this

approach, the court in *Ephedra Products* observed that the 2003 amendments to Rule 23

deleted preexisting language that had provided for "conditional" class certification, and

the *Ephedra Products* court inferred from that change that "Rule 23 must be rigorously

applied even at th[e] 'preliminary' stage."  231 F.R.D. at 170.  In addition, it appears

that the more rigorous approach finds support in the text and structure of Rule 23's

provisions, because the settlement rule (Rule 23(e)) specifically confers upon "class

members" the right to receive notice and object to the settlement proposal—objections that the court will consider at the final hearing, *see* Fed. R. Civ. P. 23(e)(1), (e)(5)—and thus strongly suggests that the class must be formed and the class members identified *prior to* the court's issuance of the notice and convening of the settlement hearing.

In any event, at the very least, district courts appear to have discretion under the Federal Rules to decide whether to subject a putative class to the full force of Rule 23 at the preliminary approval stage or merely screen for obvious impediments to class certification and leave the formal certification decision for the final approval hearing. *Cf. Larionoff v. United States*, 533 F.2d 1167, 1183 (D.C. Cir. 1976) (holding that district courts have discretion regarding the timing of the certification decision); Fed. R. Civ. P. 23(c)(1)(A) (providing that courts should decide whether or not to certify a class "[a]t an early practicable time"); *id.* 2003 advisory committee note (enumerating various "considerations [that] may affect the timing of the certification decision"); LCvR 23.1(b) (providing that, "in the exercise of its discretion[,]" a court may extend the deadline for a certification motion prescribed by the Local Rules).[10] In this Court's

---

[10] Various contextual factors might influence a court's choice between these two different approaches in a particular case. *See* 7AA Charles Alan Wright, *et al.*, *Federal Practice and Procedure* § 1785.3 (3d ed. 2005) ("The time at which the court finds it appropriate to make its class-action determination may vary with the circumstances of the particular case."). In some cases, for example, a court might choose to delay the certification decision because it is likely that information pertinent to Rule 23(a)'s requirements will come to light during the notice and objection processes that take place after the preliminary approval stage. In other cases, judicial economy might be best served by deciding the certification issue early (i.e., at the preliminary approval stage), so that the notices required by Rules 23(c)(2) (regarding certification) and 23(e)(1) (regarding settlement) can be combined. *See Manual for Complex Litigation* § 21.633. In yet other cases, concerns with the class definition might lead a court to resolve the certification issue, and thereby "define the class and the class claims, issues or defenses," Fed. R. Civ. P. 23(c)(1)(B), before the notice is issued and the putative class members are forced to choose how to respond. *See* 7A *Federal Practice and Procedure* § 1760 (noting that "hav[ing] the class described in some detail . . . may prove essential in actions under Rule 23(b)(3) in order to give class members the notice required by Rule 23(c)(2), thereby enabling them to decide whether to opt out of the action[,]" and early certification "is of considerable value . . . in connection with the notice and review of a dismissal or compromise of the action under Rule 23(e)").

view, the expansive class definition proposed in Plaintiff's complaint warrants squarely addressing class certification at the present juncture.

## B.    Court Approval Of Class Settlement Agreements

Once the court has certified a class—whether in the context of adversarial litigation or for settlement purposes—the court must play an active role in any agreement among the present parties that settles the case. *See* Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval."); *see also Manual for Complex Litigation* § 21.61 (explaining that court approval under Rule 23(e) is required regardless of "[w]hether a class action is certified for settlement or certified for trial and later settled").  In this supervisory role, the court must scrutinize any proposed settlement agreement so as to "protect[] unnamed class members 'from unjust or unfair settlements affecting their rights[.]'" *Amchem*, 521 U.S. at 623 (quoting 7B *Federal Practice and Procedure* § 1797).  With this concern in mind, the court's review of a proposed settlement agreement "must be exacting and thorough[,]" *Manual for Complex Litigation* § 21.61; indeed, some courts "have gone so far as to characterize the court's role as akin to the high duty of care that the law requires of fiduciaries." *Wong v. Accretive Health, Inc.*, 773 F.3d 859, 862 (7th Cir. 2014) (internal quotation marks and citation omitted); *see also* 4 *Newberg on Class Actions* § 13:40 ("[T]he court is said to have a 'fiduciary duty' toward absent class members during the settlement of a class suit.").  And the legal standard set forth in Rule 23(e) itself dictates that, if a proposed settlement "would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

The text of Rule 23(e) does not expound upon what constitutes a "fair, reasonable, and adequate" settlement agreement, but an advisory committee note to the 2003 amendments to that rule provides that "[f]urther guidance can be found in the Manual for Complex Litigation."  Fed. R. Civ. P. 23(e) 2003 advisory committee's note. That resource provides as follows:

> Fairness calls for a comparative analysis of the treatment of class members vis-à-vis each other and vis-à-vis similar individuals with similar claims who are not in the class.  Reasonableness depends on an analysis of the class allegations and claims and the responsiveness of the settlement to those claims.  Adequacy of the settlement involves a comparison of the relief granted relative to what class members might have obtained without using the class action process.

*Manual for Complex Litigation* § 21.62.  The Manual goes on to provide a long and non-exhaustive list of factors that courts may consider in the context of the Rule 23(e) inquiry, including "the advantages of the proposed settlement versus the probable outcome of a trial on the merits of liability and damages"; "the fairness and reasonableness of the procedure for processing individual claims under the settlement"; and "the apparent intrinsic fairness of the settlement terms."  *Id.*  The D.C. Circuit has not announced any particular set of factors that guide the Rule 23(e) fairness inquiry, but

> courts in this circuit generally consider five factors: (1) whether the settlement is the result of arm's-length negotiations; (2) the terms of the settlement in relation to the strength of plaintiffs' case; (3) the status of the litigation proceedings at the time of settlement; (4) the reaction of the class; and (5) the opinion of experienced counsel.

*Alvarez*, 303 F.R.D. at 163.  The context of each particular case determines "which factors apply and what weight to give them."  *Manual for Complex Litigation* § 21.62.

In the context of a motion for preliminary approval of a proposed settlement agreement, a court "must make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms[.]" *Id*. § 21.632. "Rule 23 itself does not outline" the preliminary settlement approval process, "nor, therefore, does it provide district courts a standard by which to adjudicate the motion for preliminary approval." 4 *Newberg on Class Actions* § 13:10. In this district, judges presented with motions for preliminary approval of a class settlement agreement typically "consider (1) whether the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, (2) whether it falls within the range of possible judicial approval, and (3) whether it has any obvious deficiencies, such as granting unduly preferential treatment." *Richardson v. L'Oreal USA, Inc.*, 951 F. Supp. 2d 104, 106–07 (D.D.C. 2013) (internal quotation marks and citation omitted); *see also* 4 *Newberg on Class Actions* § 13:10 (reporting that "courts in most circuits use some variation" of this test). Although "the standard that governs the preliminary approval inquiry is less demanding than the standard that applies at the final approval phase[,]" a court must "not simply rubber-stamp a motion for preliminary approval [of a class settlement agreement], and review is more than perfunctory." 4 *Newberg on Class Actions* § 13:13 (internal quotation marks and citations omitted). Ultimately, "[p]reliminary approval of a proposed settlement to a class action lies within the sound discretion of the court." *Richardson*, 951 F. Supp. 2d at 106 (internal quotation marks and citation omitted).

## III.    ANALYSIS

Plaintiffs have asked this Court to certify preliminarily that their discrimination lawsuit against Lockheed Martin can proceed as a class action, and they also request

that this Court provide preliminary approval of the parties' proposed Settlement

Agreement. As explained fully below, the Court is not persuaded that Rule 23(a)(2)'s

commonality requirement is satisfied, nor is it convinced that the significant fairness

issues that are apparent with respect to the terms of the Settlement Agreement can be

overcome. Therefore, this Court cannot assent to either of Plaintiffs' requests.

### A. Plaintiffs Have Failed To Demonstrate That The Proposed Class Action Satisfies The Commonality Prerequisite For Certification Under Rule 23

Plaintiffs propose to represent a class of individuals that encompasses all current

and former African-American employees at Lockheed (subject to limited exclusions not

relevant here) who received a less-than-perfect performance evaluation on at least one

occasion during a three-year period. (*See* Compl. ¶ 57.) Plaintiffs maintain that there

are more than 5,500 such individuals (*see id.* ¶ 59), and they argue that their proposed

class satisfies the commonality requirement set forth in Rule 23(a)(2) "because . . . each

member of the Class was subject to the same performance evaluation system at

Lockheed Martin." (Mot. at 23; *see also id.* ("The discrimination in pay, promotions,

and retention experienced by each member of the proposed Class is bound together by

the common, unifying system that produced the unlawful disparities complained of.").)

Unfortunately for Plaintiffs, the Supreme Court's landmark decision in *Wal-Mart*

*Stores, Inc. v. Dukes*, 564 U.S. 338 (2011), spoke directly to what is required in order to

satisfy the commonality criterion in the context of an employment discrimination class

action, and its reasoning makes abundantly clear that the commonality criterion is not

satisfied under the circumstances presented in this case.

1. <u>The Supreme Court Has Held That, To Maintain An Employment Discrimination Case As A Class Action, Rule 23(a) Commonality Requires That The Employer Have Discriminated Against All Class Members In The Same Way</u>

The Supreme Court's *Wal-Mart* decision "changed the landscape" that a district court must navigate when considering whether a putative class action satisfies Rule 23(a)'s commonality requirement. *DL v. District of Columbia*, 713 F.3d 120, 126 (D.C. Cir. 2013). In *Wal-Mart*, three current and former female employees sued Wal-Mart Stores, Inc.— "the Nation's largest private employer[,]" 546 U.S. at 342—and alleged that the company's pay and promotion practices violated Title VII's prohibition on sex discrimination under both disparate-treatment and disparate-impact theories. *See id.* at 343–45. Notably, "[p]ay and promotion decisions at Wal-Mart [were] generally committed to local managers' broad discretion, which [was] exercised 'in a largely subjective manner.'" *Id.* at 343 (quoting *Dukes v. Wal-Mart Stores, Inc.*, 222 F.R.D. 137, 145 (N.D. Cal. 2004)). Certain promotions were available only to employees who had "above-average performance rating[s]" and satisfied other objective criteria, but even for those decisions, senior managers had discretion to choose among all employees who satisfied those criteria. *Id.* The plaintiffs' theory of the case was that "a strong and uniform 'corporate culture' permit[ted] bias against women to infect, perhaps subconsciously, the discretionary decisionmaking of each one of Wal-Mart's thousands of managers—thereby making every woman at the company the victim of one common discriminatory practice." *Id.* at 345. Accordingly, the three named plaintiffs sought to litigate their case as a class action on behalf of all current and former female Wal-Mart employees, a group that was approximately 1.5 million strong. *See id.* at 342.

When it analyzed whether the case could be certified as a class action under Rule 23, the Supreme Court first observed that "[t]he class action is an *exception* to the usual rule that litigation is conducted by and on behalf of the individual named parties only[,]" *id.* at 348 (emphasis added) (internal quotation marks and citation omitted), and that Rule 23 only permits class-action treatment where the class claims are "fairly encompassed by the named plaintiff's claims[,]" *id.* at 348–49 (internal quotation marks and citations omitted). With respect to Rule 23's commonality requirement—which the Justices called "[t]he crux of th[e] case"—the Supreme Court cautioned that the Rule's "language is easy to misread" because, at first blush, virtually every class complaint raises "questions of law or fact common to the class." *Id.* at 349; *see also id.* at 349–50 (explaining that overarching questions such as "Do our managers have discretion over pay?" and "Is that an unlawful employment practice?" are certainly common to all class members, but are insufficient to establish commonality because they "give[] no cause to believe that all [class members'] claims can productively be litigated at once"). Beyond the mere identification of basic facts or general principles that are common to the members of the class, the Court explained, the commonality requirement demands that all class members' claims "must depend on a common *contention* . . . [that] is capable of classwide resolution[,]" such that "determination of [that contention's] truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350 (emphasis added). Thus, "for example, the assertion of discriminatory bias on the part of the *same* supervisor" might satisfy the commonality requirement because, under that circumstance, a common contention that is capable of

common proof—i.e., *that* supervisor exercised discretion in a discriminatory fashion—would lie at the center of each class member's claim. *Id.* (emphasis added).

The Court also expounded on the commonality requirement as it applies in the specific context of Title VII employment-discrimination class actions, explaining that because the core of any individual plaintiff's Title VII claim is "the reason for a particular employment decision," litigating many such claims (arising out of many different employment decisions) at once is only productive if "some glue hold[s] the alleged *reasons* for all those decisions together," *id.* at 352 (emphasis in original) (internal quotation marks and citation omitted).[11] Put another way, the commonality requirement is met in an employment discrimination case only where the plaintiff demonstrates "that examination of all the class members' claims for relief will produce a common answer to the crucial question *why was I disfavored*." *Id.* (emphasis in original).

In other words, the "common contention" or "glue" that binds an employment discrimination class together must bridge a "conceptual gap" between "an individual's claim that he has been denied a promotion [or higher pay] on discriminatory grounds, and . . . the existence of a class of persons who have suffered the same injury as that individual[.]" *Id.* at 352–53 (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 157–58 (1982)). And, notably, the *Wal-Mart* decision recognized two possible methods by which a plaintiff might establish the requisite common contention: a plaintiff must either (1) identify a "testing procedure or other companywide evaluation method that

---

[11] In the instant case, the Plaintiffs have pled one of their two class claims under 42 U.S.C. § 1981 rather than Title VII, but the standards articulated in *Wal-Mart* are "equally apposite to claims under th[at] statute[.]" *Burton v. District of Columbia*, 277 F.R.D. 224, 229 n.6 (D.D.C. 2011).

can be charged with bias[,]" or (2) provide "[s]ignificant proof that an employer operated under a general policy of discrimination[.]" *Id.* at 353 (quoting *Falcon*, 457 U.S. at 159 n.15). Requiring that one of these avenues be pursued ensures that, when evaluating the certification motion, the court does not lose sight of the need to "'identify[] the specific employment practice that is challenged'" as producing a racially disparate outcome, *id.* at 357 (quoting *Wards Cove Packing Co.*, 490 U.S. at 656), which is a key task that even individual plaintiffs must accomplish in a Title VII case. *Cf. Falcon*, 457 U.S. at 159 n.15 ("[I]t is noteworthy that Title VII prohibits discriminatory *practices*, not an abstract policy of discrimination." (emphasis in original)). (*See also* Part I.A, *supra.*)

Turning to the particular claims at issue in *Wal-Mart*, the Supreme Court observed that the named plaintiffs had not sought to identify a biased companywide evaluation method, and had also failed in their attempt to provide "significant proof that Wal-Mart operated under a general policy of discrimination." *Wal-Mart*, 564 U.S. at 353 (internal quotation marks omitted). The Court noted that the only policy the plaintiffs had identified was the "'policy' of *allowing discretion* by local supervisors over employment matters[,]" *id.* at 355 (emphasis in original), and it explained that, because the simple fact of delegating decisions "should itself raise no inference of discriminatory conduct," *id.* (quoting *Watson*, 487 U.S. at 990), to establish sufficient commonality, the plaintiffs needed to "identif[y] a common mode of exercising discretion that pervades the entire company[,]" *id.* at 356. The plaintiffs failed to do so, the Court held, because they had produced only regional and national disparity data rather than the sort of granular, store-by-store data that could demonstrate truly

pervasive discrimination.  *See id.* at 356–57.  And the Court made clear that even more granular disparity data would not necessarily have cured the commonality defect, because such data alone could not establish the necessary "specific employment practice" (i.e., a "common mode of exercising discretion") that produced a disparate impact in a manner that was common to the class.  *Id.* at 356–57.

In the end, after analyzing facts and claims that are strikingly similar to those that are presented in the instant case, the Supreme Court offered a summation for its discussion of commonality in a Title VII employment class action that echoes resoundingly in the case before *this* Court: "Merely showing that [an employer]'s policy of discretion has produced an overall sex-based disparity does not suffice."  *Id.* at 357.

> 2.  Plaintiffs Have Not Established That Lockheed's Performance Review System Causes Racially Disparate Outcomes In A Manner That Can Be Established Through Common Proof

As explained, the plaintiffs in *Wal-Mart* sought to litigate employment discrimination claims on behalf of all female current and former Wal-Mart employees. If *Wal-Mart* teaches anything, it is that plaintiffs can maintain such an employment discrimination lawsuit as a class action only if they can identify a company-wide "common contention" regarding the *reasons* that each member of the class has suffered an injury.  *See* 564 U.S. at 350.  As discussed above, *Wal-Mart* recognized two methods by which a plaintiff can thread together many individuals' employment discrimination claims so as to demonstrate that they can productively be litigated at once: by pointing to a "testing procedure or other companywide evaluation method that can be charged with bias[,]" or by providing "[s]ignificant proof that an employer operated under a general policy of discrimination[.]"  *Id.* at 353 (quoting *Falcon*, 457 U.S. at 159 n.15).

In this Court's view, Plaintiffs in the instant case have done neither, and thus have fallen far short of establishing a commonality of issues as Rule 23(a)(2) requires.

First of all, try as they might, Plaintiffs have failed to identify a "testing procedure or other companywide evaluation procedure *that can be charged with bias*." *Id*. (emphasis added). This is so notwithstanding Plaintiffs' vigorous efforts to characterize Lockheed's performance appraisal system as a "companywide evaluation method" (Suppl. Mem. at 2 (internal quotation marks and citation omitted)), and to assert that several common elements of that system are "flawed" (Compl. ¶ 11). Plaintiffs allege, for example, that the group "calibration sessions" at which multiple managers were required to discuss many employees and assign them into one of four performance "tiers" suffered from inadequate information about each employee under consideration and often required apples-to-oranges comparisons between employees with different positions. (*See* Compl. ¶ 23.) But the contention that the companywide evaluation procedures often resulted in ratings that were poorly correlated with job performance (*see id*. ¶¶ 17–24), however plausible, does not supply an account of how those procedures themselves resulted in the racially disparate outcomes that Plaintiffs have observed in Lockheed's overall workforce. That is, in order make a plausible "charge[]" that a companywide evaluation method is infected "with bias[,]" *Wal-Mart*, 564 U.S. at 353, it is clear that a plaintiff must provide some "detail about *how* th[at] examination[] operated in a biased way." *Burton*, 277 F.R.D. at 229 (emphasis in original); *see also Wards Cove*, 490 U.S. at 657 (explaining that in a disparate impact case, "a plaintiff must demonstrate that it is the application of a specific or particular

employment practice that has created the disparate impact under attack"). Plaintiffs here have taken no steps whatsoever toward accomplishing this critical goal.

Nor have Plaintiffs provided "significant proof" that Lockheed "operated under a general policy of discrimination." *Wal-Mart*, 564 U.S. at 353. As was the case in *Wal-Mart*, Plaintiffs have not identified any affirmative policy that had a demonstrably discriminatory intent or effect on African-American Lockheed employees; instead, the only connection that Plaintiffs have mustered between Lockheed's policies and the allegedly racially disparate performance-review outcomes is the allegation that "[t]he absence of measurable indicators" in Lockheed's individual performance reviews "resulted in inadequate safeguards against bias in the assessment of African American employees." (Compl. ¶ 18; *see also id.* ¶ 19.) But just as in *Wal-Mart*, that allegation attributes racially disparate outcomes to the "policy" of committing unrestrained discretion to individual supervisors, *see* 564 U.S. at 355, and such a discretionary system can only amount to a policy of discrimination that is susceptible to common proof if Plaintiffs "identif[y] a common *mode* of exercising discretion that pervades the entire company[,]" *id.* at 356. The mere fact that all of Lockheed's supervisors used the same allegedly ill-defined numerical rubric to grade employee performance (*see* Compl. ¶¶ 17–21)—an aspect of the system that *constrained* supervisor discretion, even if inadequately—says nothing about how individual supervisors exercised what discretion was left to them, and after *Wal-Mart*, it is clear beyond cavil that such silence isn't enough.

To state the point succinctly: in order to establish the requisite commonality with respect to a discrimination challenge to an employee-review system that permits various

managers to exercise discretion, Plaintiffs needed to demonstrate "that all managers would exercise their discretion in a common way[,]" *Wal-Mart*, 564 U.S. at 356, and they have not done so. Other than pleading, "upon information and belief," that "the racial disparity in ratings [under Lockheed's performance evaluation system] is statistically significant" (Compl. ¶ 15), Plaintiffs have pointed to no evidence of biased decision making of any kind, and certainly not statistical evidence of the type that demonstrates that the discretionary ratings decisions led to racially disparate outcomes *in a common way*. *See Wal-Mart*, 564 U.S. at 357; *see also Watson*, 487 U.S. at 994 (plurality opinion) (noting that in a disparate impact case, "the plaintiff must offer statistical evidence of a kind and degree sufficient to show that the practice in question has caused the exclusion of applicants for jobs or promotions because of their membership in a protected group").

Notably, even the anecdotal allegations of the two named plaintiffs fall short of giving rise to any belief that a common mode of discretionary decision making resulted in consistent race discrimination against the entire class. First of all, two anecdotes in a class of over 5,500 almost certainly do not constitute "substantial proof" that any commonalities between them are pervasive throughout the class. *See Wal-Mart*, 564 U.S. at 358 (explaining that "roughly one account for every eight members of the class" might substantiate an inference that discrimination was pervasive, but "about 1 for every 12,500 class members" would not). Second, if anything, the allegations of the two named plaintiffs are more notable for their differences than for their similarities. Plaintiff Josey points to a disparity between her high individualized numerical ratings and her below-average tier rating as evidence of discrimination (*see* Compl. ¶ 36),

whereas Plaintiff Ross alleges no such disparity (*see id.* ¶¶ 45–56). Plaintiff Ross intimates that he was discriminated against by virtue of being lumped in with other employees during calibration sessions even though "there are no proper comparators for his position" (*id.* ¶ 50), whereas Plaintiff Josey alleges that her calibration sessions were suspect because she was compared against both managers and non-managers (*see id.* ¶ 38). All in all, then, it is clear to this Court that Plaintiffs have failed to demonstrate that the challenged performance evaluation system resulted in race discrimination against all class members through a mechanism that could be established through common proof.

The cases that Plaintiffs highlight in which courts have certified employment-discrimination classes on the basis of companywide discretionary evaluation systems all involved some thread that tied the many discretionary decisions together—the very thing that is absent here. For example, Plaintiffs rely on *McReynolds v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, a Seventh Circuit decision affirming certification of a class of African-American financial advisors that sued their employer for racially discriminatory compensation practices. *See* 672 F.3d 482, 483 (7th Cir. 2012), *abrogated on other grounds as recognized by Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 559 (7th Cir. 2016). (*See* Suppl. Mem. at 5–6.) In that case, the defendant "delegate[d] discretion over decisions that influence the compensation" of individual employees to many different supervisors, but the plaintiffs pointed to a companywide policy that plausibly infected those decisions with discrimination in a common manner. *Id.* at 488. Specifically, the plaintiffs identified a "teaming policy" that enabled brokers who were members of teams to increase their compensation, *see id.*, and they alleged

that, because individual brokers were allowed to pick their own team members pursuant to that policy, the teams became "little fraternities" in which "brokers choose as team members people who are like themselves" along racial lines, *id.* at 489. Thus, the companywide "teaming" policy explained the common and allegedly discriminatory manner in which the brokers were exercising their discretion in a way that was central to the plaintiffs' disparate impact claims, and as a result, the court found that the policy's legality was susceptible to common proof. *See id.*

Plaintiffs also highlight *Moore v. Napolitano*, a decision from this District in which current and former employees of the United States Secret Service sought certification for a putative class action alleging discrimination in the Secret Service's promotion practices. *See* 926 F. Supp. 2d 8, 11–12 (D.D.C. 2013), *pet. for permission to appeal denied sub nom. In re Johnson*, 760 F.3d 66 (D.C. Cir. 2014). (*See* Mot. at 29.) "[D]ifferent decision makers no doubt injected some subjectivity into the evaluations of different class members" in that case; however, crucially, "every promotion decision was ultimately made by the Director of the Secret Service." *In re Johnson*, 760 F.3d at 73; *see also Wal-Mart*, 564 U.S. at 350 (hypothesizing that "the assertion of discriminatory bias on the part of the same supervisor" could satisfy the commonality requirement). Plaintiffs have not alleged any similarly centralized performance evaluation process here.

Consequently, unlike in the cases Plaintiffs cite, Plaintiffs have not identified a "common contention" that "is central to the validity of each one of the [class members'] claims" and that "is capable of classwide resolution[.]" *Wal-Mart*, 564 U.S. at 350. It cannot be overstated that Plaintiffs' mere reliance on an alleged racial disparity in

overall employment outcomes (*see* Compl. ¶ 15) does not establish commonality, because "merely proving that [a] discretionary system has produced a racial or sexual disparity *is not enough*[,]" *Wal-Mart*, 564 U.S. at 357 (emphasis in original). And it is similarly insufficient to point to the performance appraisal system *as a whole* and contend, as Plaintiffs do, that it acted as "an identical or similar headwind against all class members." (Suppl. Mem. at 4.) Rather, in any disparate impact case, "a plaintiff must demonstrate that it is the application of *a specific or particular employment practice* that has created the disparate impact under attack." *Wards Cove*, 490 U.S. at 657 (emphasis added). This important work is required in all disparate impact cases, but it "is all the more necessary when a class of plaintiffs is sought to be certified" because the court must satisfy itself that the class members' claims are susceptible to common proof. *Wal-Mart*, 564 U.S. at 357.

With neither an account of how the common features of the performance appraisal system led to racially disparate outcomes (other than by enabling discretionary decisions by individual supervisors), nor "statistical evidence of a kind and degree sufficient to show that the practice in question has caused" race discrimination, *see Watson*, 487 U.S. at 994 (plurality opinion), Plaintiffs cannot assure this Court that class members will actually share "a common answer to the crucial question *why was I disfavored*." *Wal-Mart*, 564 U.S. at 352 (emphasis in original). Indeed, common answers are especially elusive under the circumstances presented here, as Plaintiffs apparently anticipated, given the broad class definition (which contains no limitation that ensures all class members have suffered the same adverse action or have otherwise been personally affected by Lockheed Martin's performance appraisal

system), and the expansive series of probing questions on the proposed claim form. Plaintiffs' expected class clearly encompasses individuals with widely varying experiences of discrimination. (*See* Compl. ¶ 57 (proposing a class definition that lacks any injury criteria and thus includes a broad and diverse swath of employees); *see also* Suppl. Decl. of Cyrus Mehri, ECF No. 13-6, ¶ 4 (admitting that "[t]he Claim Form . . . does not limit the compensation, promotion, and termination claims for which Claimants will be compensated to those for which they could establish a link between their performance appraisal ratings and the allegedly discriminatory actions").)[12] Such potential breadth of experiences and claims among the putative class members is not the mark of a class that meets the commonality requirement of Rule 23(a).

**B.      Plaintiffs Have Failed To Make A Preliminary Showing That The Terms Of The Proposed Settlement Agreement Are "Fair, Reasonable, And Adequate"**

Even if this lawsuit could be certified as a class action consistent with Rule 23, its settlement could not be approved at this juncture without "a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms[.]" *Manual for Complex Litigation* § 21.632; *see also* Fed. R. Civ. P. 23(e)(2) ("If [a proposed settlement] would bind class members, the court may approve it only after a

---

[12] The absence of any injury-focused limitation in Plaintiffs' class definition is telling, and it stands in stark contrast with class definitions in similar cases in which classes have been certified. *See, e.g.*, *Moore*, 926 F. Supp. 2d at 16 (certifying class of "[a]ll current and former African-American Special Agents who bid for promotion to a GS-14 position from 1995–2004 *and were not promoted to GS-14 on the first bid list on which they bid*" (emphasis added)); *McReynolds v. Sodexho Marriott Servs., Inc.*, 208 F.R.D. 428 (D.D.C. 2002) (certifying class of "all African-Americans who are or were salaried employees of Sodexho . . . who have held or sought to obtain [management positions], and who have been, continue to be, or may in the future be *adversely impacted by* Sodexho's racially discriminatory policies and practices affecting promotions or advancement" (emphasis added)).

hearing and on finding that it is fair, reasonable, and adequate."). As explained above, in this district, courts presented with motions for preliminary approval of class settlement agreements consider such fairness-related factors as "(1) whether the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, (2) whether it falls within the range of possible judicial approval, and (3) whether it has any obvious deficiencies, such as granting unduly preferential treatment." *Richardson*, 951 F. Supp. 2d at 106–07 (internal quotation marks and citation omitted). These and other related considerations, which are discussed below, compel this Court to conclude that the terms of Plaintiffs' proposed Settlement Agreement are sufficiently problematic that the agreement cannot be approved, even preliminarily.

To be sure, and to the parties' credit, this Agreement "appears to be the product of serious, informed, non-collusive negotiations." *Id.* Plaintiffs report that the parties engaged in "eleven days of in-person and numerous telephonic mediation sessions[,]" during which they discussed "statistical analyses, company policies and practices, and anecdotal evidence in this case." (Mot. at 12.) Lockheed apparently "produced electronic human resource data[,]" and Plaintiffs' counsel "retained a labor economics expert . . . to conduct statistical analyses of [that] data." (*Id.*) These facts satisfy the Court that the parties' negotiations were vigorous and well-informed. *See Richardson*, 951 F. Supp. 2d at 106–07. But that alone is not enough to establish that the resulting agreement is *fair* to the absentee class members. And the terms of the Settlement Agreement that bear on the other fairness considerations mentioned above plainly

indicate that the negotiating parties have given the absentee class members' interests short shrift in several respects.

First, and most notably, there is a gross imbalance between the claims that are actually at issue in this case and the claims that the class members who participate in the settlement would be required to release. *See Manual for Complex Litigation* § 21.62 (explaining that the "[r]easonableness [of a settlement agreement] depends on an analysis of the class allegations and claims and the responsiveness of the settlement to those claims"). Plaintiffs have consistently and unabashedly maintained that "the primary focus of the Complaint is on flaws in the performance appraisal system" (Suppl. Mem. at 13); yet, they also candidly acknowledge that, somehow, class members are required to "release Lockheed Martin from *all* types of racial discrimination claims" under the terms of the Settlement Agreement (*id*. at 12 (emphasis added) (citing Settlement Agreement at 22–23)). Plaintiffs have provided no reasonable explanation for the Settlement Agreement's mandate that a class member relinquish her right to bring race discrimination claims that have nothing to do with the performance review system in order to settle a case about allegedly discriminatory performance reviews—and this Court sees none. And even more puzzlingly, the Agreement's proposed broad release of claims sweeps even further: although the class period ended in 2016, class members agree release all race discrimination claims *that arise at any time* up until the Court finally approves the Settlement Agreement (*see* Settlement Agreement at 22), and not only do class members agree to release all race discrimination claims regarding the terms and conditions of their employment, they also

assent to give up "claims of alleged racial discrimination . . . *in the provision of employee benefits*" as well (*id.* (emphasis added)).

It is perhaps not surprising that Lockheed would assent to such an agreement—in one fell swoop, this proposed settlement forecloses any and all potential race discrimination claims that thousands of African-American employees might otherwise have brought against the company. But it is shocking to this Court that counsel for the putative class members would contend that a release this broad and consequential is a "fair" bargain as it relates to the absent individuals whose potential legal claims are effectively extinguished by it. The sheer breadth of the released claims alone, when compared to the scope of the claims in the complaint, is enough to cause this Court to have serious doubts about whether the proposed Settlement Agreement comes anywhere close to "fall[ing] within the range of possible judicial approval[.]" *Richardson*, 951 F. Supp. 2d at 107.

The opt-out procedure laid out in the Settlement Agreement provides another source of serious concern. Under the Agreement, class members who do not respond to the class notice in any manner—that is, who neither complete and submit the extensive claim form nor comply with the prescribed opt-out procedures—will not only release all of their race discrimination claims against Lockheed Martin but will also become ineligible to recover *any* compensation from the settlement fund. (*See* Settlement Agreement at 24.) That is exactly the sort of circumstance that raises legitimate questions about the fairness of a settlement agreement. *See* 4 *Newberg on Class Actions* § 13:60 (noting that "[c]ompromising claims without compensation" is a "red flag in proposed settlements"). Additionally, if Plaintiffs' counsel is correct that it is likely

that thousands of class members will not even respond to the class notice, much less affirmatively opt out (*see* Tr. of Oral Arg. at 33–34 (counsel's assertion, based on past experience, that the response rate is likely to be 30–50%), then this Settlement Agreement effectively allows Lockheed to inoculate itself against any and all race discrimination and race-related benefits claims by a huge swath of its African-American employees for a price that hardly seems "adequate."

This Court is also quite concerned about the miniscule amount of information that an absent class member will have about (1) the legal claims that are implicated in the settlement process, and (2) his or her anticipated recovery, at the time the opt-out decision is made. *See Manual for Complex Litigation* § 21 (listing "the fairness and reasonableness of the procedure for processing individual claims under the settlement" as a relevant factor under Rule 23(e)). That is, for all its detail, the class notice provides no sense of what the minimum recovery is likely to be; no sense of what the average recovery is likely to be; and no sense of how giving particular answers on the claim form will likely influence the amount of a class member's recovery. Plaintiffs' counsel explains that none of this information is discernable until the Claims Administrator reviews all of the claim forms and develops information regarding the number and type of race discrimination claims that may exist throughout the class. (*See* Tr. of Oral Arg. at 69.) But that is *exactly* the defect that makes this settlement so potentially damaging to the absent class members—if they had been participants in this litigation from the start, Plaintiffs' counsel would have already investigated their discrimination allegations and would be in a position to provide them with critical information about the estimated value of the claims that the Settlement Agreement

releases. As things currently stand, this Court has no idea how Plaintiffs' counsel could possibly have determined that the amount that Lockheed is offering to settle this case is sufficient to redress the legal claims of the class members without having already gathered information regarding the universe of claims at issue. And of course, if Plaintiffs' counsel *does* have some knowledge of, and projections about, the scope of the absentee class members' discrimination claims, then the value of those claims can be estimated, at least in general terms, and this recovery-related information should be provided to the class as part of the notice.[13] What is more, it is clear to this Court that no reasonable counsel advising an individual absent class member would encourage his client to agree *ex ante* to release legal claims that the lawyer has not yet evaluated in exchange for nothing other than the vague hope that a claims official might subsequently do the work of assessing the strength of his client's case and paying a worthy settlement amount. And yet, that appears to be precisely what Plaintiffs' counsel proposes for the absent class members in the context of the settlement at issue in this case.

The bottom line is this: a putative class member needs to be able to make an informed determination regarding whether or not to opt out of a class settlement, and this is especially so when the proposed agreement requires him or her to give up potentially viable legal claims in exchange for the promise of a monetary recovery.

---

[13] This is to say, Plaintiffs' counsel cannot have it both ways. Either (1) he has no clue about what the class members will report on the claim form regarding their experiences with race discrimination, in which case no individual recovery estimates can be provided, but he also cannot possibly have made a rational determination that the $22.8 settlement fund is adequate to cover all of the class members' claims, or (2) he is sufficiently aware of the scope and nature of the class members' potential claims that he can assert with confidence that the settlement fund amount is adequate, but if this is so, then he should be able to provide the class members with information about the anticipated recovery if they decide to participate in the settlement.

Ordinarily, and ideally, when faced with such a choice, the class member would want to know how much the claims he is releasing are likely to be worth, so that this figure can be compared to the amount being offered in settlement of those claims. In the typical case involving a settlement class, this math is easily done, because the claims in the complaint are all that is at issue, and class counsel presents a settlement agreement with a negotiated amount that relates in some discernable way to the legal claims that will be released. *See, e.g.*, *In re APA Assessment Fee Litig.*, 311 F.R.D. 8, 13, 19 (D.D.C. 2015) (approving settlement agreement that "represent[ed] close[] to 13% of plaintiffs' best possible recovery" and under which "Claimants w[ould] receive a pro rata share of the fund based on the amount of . . . fees they paid during the class period"); *Alvarez*, 303 F.R.D. at 157 (approving settlement agreement that "provide[d] for a monetary payment to each of the[] class members consisting of 1.37 times the amount owed for overtime during the relevant period"). But even if the overall value of the released claims is uncertain, at a minimum, any informed opt-out determination requires information regarding the estimated amount that a class member would be expected to receive if she participates, and it is no answer to say, as Plaintiffs do here, that 'an estimate is not possible because we do not yet know the scope of the claims being released.' (*See, e.g.*, Tr. of Oral Arg. at 69.) Far from curing the problem, the fact that Plaintiffs themselves purport to have not yet fully evaluated the claims that class members are relinquishing in this action *underscores* the fundamental fairness issues described above, and suggests that, rather than doing what is necessary to ensure that all class members' rights are protected and advanced, Plaintiffs have opted to bind their

fellow class members indiscriminately and rely on a claims administrator to do the heavy lifting of sorting it all out on the back end.

In light of all of these deficiencies, which this Court has considered individually and in the aggregate, the Court is compelled to conclude that Plaintiffs have failed to demonstrate that the proposed Settlement Agreement is sufficiently "fair, reasonable, and adequate" to satisfy the standard for preliminary approval.

## IV. CONCLUSION

In this lawsuit, Plaintiffs seek to certify a class for settlement purposes that, in effect, is comprised of virtually every salaried African-American employee of Lockheed Martin. Plaintiffs say that the 5,500-plus members of their proposed class have suffered race discrimination as a result of Lockheed's performance review process, and have been victimized in a manner that is susceptible to common proof, but Plaintiffs do not present any theory of *how* the performance appraisal system resulted in racially disparate outcomes, much less evidence that the challenged system discriminates against all class members in the same way, as the commonality element of Federal Rule of Civil Procedure 23(a) requires. Moreover, the broad release of legal claims in the proposed Settlement Agreement strongly suggests that the parties have endeavored to use this case to resolve the entire universe of race discrimination claims that these class members might have against Lockheed, via a lawsuit that is purportedly much more limited in scope. This imbalance creates serious fairness concerns with the breadth of the release, the adequacy of the settlement fund, the prescribed opt-out procedures, and the overall claims administration process. All this leads this Court to the firm but reluctant conclusion that this case cannot be preliminarily certified as a class action

under Rule 23, and that the parties' proposed Settlement Agreement is so potentially unfair that it cannot be preliminarily approved. Accordingly, as set forth in the accompanying Order, Plaintiffs' motion for preliminary certification and approval will be **DENIED**.

DATE: July 28, 2017

*Ketanji Brown Jackson*
KETANJI BROWN JACKSON
United States District Judge